FLORENCE CAROLYN BALCH MONTGOMERY v.
THE FIRST NATIONAL BANK OF NEWPORT, ARKANSAS,
AS ADM., ET AL

5-4778                                           439 S.W. 2d 299

Opinion Delivered April 1, 1969

*Lee Ward* for appellant.

*Pickens, Pickens & Boyce* by *Kenneth H. Castleberry* for appellees.

JOHN A. FOGLEMAN, Justice. This appeal is a sequel to *Montgomery* v. *First National Bank of Newport*, 242 Ark. 329, 414 S.W. 2d 109. The substance of the complaint of appellant is stated there. We held that it stated a cause of action against the administrator of the estate of Lucas G. Balch, appellant's father and her legal guardian, and the surety on his bond as guardian. We held that a demurrer contained in an amended answer filed by appellees did not properly raise the defenses of limitations and laches because the complaint contained allegations that Balch concealed the fraud charged by his daughter in her complaint and because the statute of limitations did not begin to run until Balch, as a fiduciary, had repudiated his trust.

On remand the cause was tried on the pleadings filed prior to the first appeal. The defenses raised by the answers of appellees were the statute of limitations, a release of Balch and his surety by receipt executed by appellant, a general denial, and laches. The latter defense was based upon allegations that appellant's action was brought after the death of her father, the only witness familiar with the entire matter. It was also alleged that virtually six years intervened between the close of the guardianship on which appellant based her

cause of action and the filing of this suit. It appears to be undisputed that the assets of the guardianship consisted of a $10,000 savings and loan certificate issued by Newport Federal Savings and Loan Association on November 28, 1951, United States Savings Bonds having a maturity value of $2,900, and a bank account amounting to $882.58. Most of these assets were investments of proceeds from National Service Life Insurance on her brother. After a trial on the merits, appellant's complaint was found to be without merit by the chancery court and was dismissed with prejudice.

Appellant relies on two points for reversal. They are:

I. *Alleged error in allowing attorney Fred M. Pickens, Jr., to testify for appellees;*

II. *The trial court's finding the appellant's claim was without merit is against the preponderance of the evidence.*

We shall discuss these points in the order listed.

I.

Lucas G. Balch was appointed legal guardian of appellant, his daughter, in the probate court of Jackson County in 1951. Appellant became 18 years of age on August 15, 1959. Balch died about November 21, 1965, in Jackson County. At all times during the guardianship, the guardian was represented by the law firm of Pickens, Pickens and Boyce, or its predecessor. Fred M. Pickens, Jr., was the attorney in this firm who actually represented and advised Balch. He assisted Mr. Balch in the preparation of the guardian's final accounting and all matters pertaining to the termination of this guardianship. He obtained an order on October 27, 1959, vesting the assets of the guardianship in appellant. He also drafted a receipt, waiver of notice

and entry of appearance for the signature of Florence C. Balch. This instrument, in which appellant acknowledged receipt of all moneys and property due her and consented to the entry of an order in the probate court confirming the final accounting of the guardian, was purportedly executed in his presence. Appellant denied executing this instrument. The order confirming the final settlement and discharging the guardian and his surety was obtained by this attorney.

Appellant alleged that she never received any of the money or property of the guardianship and that she was unaware of the existence of this receipt until January 12, 1966. Although her name was signed to a request for payment endorsed on the United States Savings Bonds and dated October 29, 1959, she testified that she did not sign the bonds or receive any of the proceeds. According to Pickens, the bonds and savings and loan certificate were kept in his safe until appellant and her father came to his office after the entry of the order vesting the assets in her. He testified that the savings and loan certificate was delivered on the same date that appellant signed the bonds and that a new certificate dated November 1, 1959, issued to appellant was placed in his custody and put in his safe. He also testified that this certificate was delivered by him to Mr. Balch on January 26, 1960, when Balch advised Pickens that appellant and her husband wanted to use it to buy a motel owned by Balch.

The record indicates that Pickens did not participate in any of the proceedings in this case except as a witness. All of the pleadings on behalf of appellees are signed by either Wayne Boyce or Kenneth H. Castleberry, both connected with the law firm. No appearance by Pickens as an attorney is noted in any part of the record. When the trial commenced, it was noted that appellees appeared by attorney Kenneth Castleberry of Pickens, Pickens and Boyce. While appellant argues that Pickens gave instructions to his associate,

Castleberry, while on the witness stand, she bases this contention upon statements in the record that Pickens offered suggestions to Castleberry as to methods of preserving the record. We deem this to be too insignificant to constitute an actual participation in the trial of the case.

Appellant relies upon Canons 6 and 19 of the Canons of Ethics promulgated by the American Bar Association and adopted by this court and upon our holding in *Rushton* v. *First National Bank,* 244 Ark. 503, 426 S.W. 2d 378. We do not find reversible error on this point.

At the outset, it should be noted that the trial of this case was had on January 16, 1968, some ten weeks prior to our decision in the *Rushton* case. It was also about thirteen weeks prior to the delivery of our opinion in *Old American Life Insurance Co.* v. *Taylor,* 244 Ark. 709, 427 S.W. 2d 23, wherein we reiterated the admonition that neither the partner nor other members of the firm should participate in the trial of the case when one of them was a witness therein. There had been a widely held opinion that the requirements of Canon 19 were met when the testifying partner left the trial of the case to other members of his firm. See Formal Opinion 220 reproduced as an Addendum to the *Rushton* opinion at page 517.

Canon 19 provides as follows:

" 'When a lawyer is a witness for his client, except as to merely formal matters, such as the attestation or custody of an instrument and the like, he should leave the trial of the case to other counsel. Except when essential to the ends of justice, a lawyer should avoid testifying in court in behalf of his client.' "

The *Rushton* case was the first case in this state in which reversible error was based upon a violation of

the Canons of Ethics. Prior to that decision, it had never been held in Arkansas that the testimony of a lawyer was incompetent or inadmissible merely because he or a member of his firm participated in the trial. See *Hutchinson* v. *Phillips*, 11 Ark. 270; *Milan* v. *State*, 24 Ark. 346; 97 C.J.S. Witnesses § 71, p. 456 et seq.; 58 Am. Jur. 110, Witnesses, §§ 152, 153. Our reversal in the *Rushton* case was not based solely upon a violation of Canon 19. The primary basis of the reversal of the case was the abuse of discretion by the trial court in permitting an attorney for one of the parties to testify even though he had remained in the courtroom during the entire proceedings prior to his being called as a witness, in spite of the fact that the witnesses had been excluded from the courtroom under Ark. Stat. Ann. § 28-702 (Repl. 1962) at the request of the opposing counsel.

When Pickens was called as a witness in this case, appellant promptly objected. The objection was that his testimony would be in violation of Canon 19 and, because he had represented the appellant in two other "items" of litigation,[1] in violation of canon 6.[2] The chancellor ruled that a blanket objection was not appropriate and overruled the objection. Although a substantial part of the testimony of Pickens was directed to matters pertaining to the attestation, custody and delivery of certain instruments, no further objection to any of his testimony was made by appellant until the conclusion of his testimony. After extensive cross-examination about the matters testified by him on direct examination, appellant's attorney made the following motion:

---

[1] These were divorce suits by appellant against her first two husbands.

[2] Insofar as pertinent, this canon reads: "The obligation to represent the client with undivided fidelity and not to divulge his secrets or confidences forbids also the subsequent acceptance of retainers or employment from others in matters adversely affecting any interest of the client with respect to which confidence has been reposed."

"If the Court please, the plaintiff renews her motion to strike the testimony because the witness obviously served as legal adviser to the plaintiff. Any information he has is privileged."

Although privileged communications cannot be disclosed through the testimony of an attorney, the failure of the beneficiary of the privilege to object to the admissibility of the questioned testimony renders it competent. *Maloney* v. *Maryland, Casualty Co.*, 113 Ark. 174, 167 S.W. 845. A motion to strike all of a witness' testimony is properly denied where any of the testimony is admissible. *Young* v. *Arkansas State Highway Commission*, 242 Ark. 812, 415 S.W. 2d 575. The testimony of Pickens as to the attestation, custody and delivery of the bonds, the savings and loan certificate and the receipt of appellant was admissible under any view. Even if some part of the testimony of Pickens which appellant contends was in violation of the attorney-client privilege was inadmissible, the denial of the motion to strike all his testimony was proper. Furthermore, a motion to exclude testimony comes too late when it is made after cross-examination of the witness by the moving party without objection having been made when the particular testimony was offered. Otherwise, one could speculate on eliciting favorable answers on cross-examination and then have the testimony excluded if they turned out to be unsatisfactory. *Poinsett Lumber & Mfg. Co.* v. *Traxler*, 118 Ark. 128, 175 S.W. 522. It should be noted that the motion to strike was in no way related to Canon 19.

The court also properly overruled the blanket objection made by appellant before Pickens ever was asked a question. As above pointed out, the major portion of his testimony was admissible and he was a competent witness. Until the exact nature of the testimony to be elicited from Pickens could be ascertained, the court could not possibly know whether all or any part of it was inadmissible or, as a matter of fact,

whether all or any part of it was actually in violation of either of the canons.

We have not yet held that testimony by an attorney in violation of Canon 19 is, standing alone, a basis for holding the testimony inadmissible. Yet, we are not in any manner diluting the effect of the decision in the *Rushton* case or the caveat in the *Taylor* case. We did not, in either of these cases, and we do not now, hold that an attorney is incompetent as witness or his testimony inadmissible only because of a violation of Canon 19, although disciplinary procedures might be appropriate. Any doubts about the application of these canons should be resolved by a declination of employment by any member of a law firm when a partner or associate may become a witness or by withdrawal of the firm from the representation when it becomes apparent that the testimony of a member or associate on behalf of a client will become necessary. We recognize, however, that there will be cases in which the necessity for a lawyer testifying cannot be anticipated until a stage of the trial at which his withdrawal, or that of his firm, would be impossible without serious injustice to his client. In such a case withdrawal should not be expected, but it should be clear that the necessity for the lawyer's testimony could not have been anticipated.

## II.

Appellant relied entirely upon her own testimony to establish her contention that she was defrauded by her father. Even if we exclude the testimony of the attorney in the case and ignore contradictions, vacillations and equivocations in appellant's testimony, so that it is given the strongest probative force, we cannot say that the finding of the chancellor was against the preponderance of the evidence.

Appellant, now 26 years of age, had lived in Newport in her father's home all her life until her maturity.

Her mother died when appellant was born. She and her
father were living at a motel owned by him and called
Cherokee Courts when she became 18. This motel had
12 units, one of which was used for an office and three
for home of the father and daughter. She stated that
her father had a drinking habit and would become cruel
when drinking. Because of this, she said that she was
afraid of him.

According to her, she went to Memphis just a few
days after she was 18. Her father did not see her for
about three weeks. She claimed that she then returned
to Newport because her father wanted to talk to her
about the "probate business" and about "getting
the bond deal settled and coming home." She talked
with her father and returned to Memphis for another
two weeks, after which she returned to Newport because
her father called and said he wanted to talk to her. She
said that, on the occasion of the second return to New-
port, she talked with Mr. Pickens about the bonds at his
office and asked him when everything would be settled.
She only stayed one day, after which she returned to
Memphis. She was in Newport, in October, at her
father's request. On this occasion she stated that her
father loaned her around $3,000, partly in cash and the
balance in checks her father said she could write. She
also stated that she was in Newport in November, 1959.
Sometime during that month, she married a man named
Higginbotham, although her father did not approve.

She denied having signed her name to request pay-
ment of the United States Savings Bonds or knowing
the person whose name is signed as a witness to her sig-
nature. She denied getting any of the proceeds of these
bonds. She denied any knowledge of a bank account in
the First National Bank of Newport opened about the
time of the closing of the guardianship and carried in
the name of Carolyn Balch Higginbotham, with the
name Higginbotham having been added in pencil and
with her correct addresses shown on the ledger sheet.

She did admit that her father told her that he had opened a bank account for her in the First National Bank but that he did not tell her how to write checks. She signed checks using the name "Carolyn Balch Higginbotham," the exact designation of the account on the bank's books. She claimed to have been unaware that any of the proceeds of the savings bonds went into that account but admits having written checks on the account for more than $3,000 over a period of less than three months. She admitted that she used the money for her own purposes but claims that it was the money loaned her by her father. The bank records show that this bank account was opened by the transfer of $530.08 on October 5 from the guardian's account. Other items drawn on the latter account closed it on October 12. These items were court costs. The bank's records show the deposit of $2,650.04 to her account on November 5 as the proceeds of the bonds. The date of redemption shown on the bonds is November 4. Mrs. Montgomery testified that she opened no account in that bank.

Appellant also denied having received the proceeds of the savings and loan certificate. She denied the endorsement of her name thereon. She admitted having gone to the Newport Federal Savings and Loan Association in 1960 and having talked to one Don Smith and a Mr. White while there. She stated that she was asking Don Smith about papers she had signed when they showed her a bond with her father's name on it and opened up the books. She denied ever having seen the certificates issued in her name in lieu of the certificate held by the guardian. Mrs. Montgomery left Higginbotham in November of 1960 and came back to Newport to live with her father. She had bought a Chrysler Imperial, for which she paid cash in November 1959, wrecked it in December 1959, then bought a '57 Buick traded it in on a '57 Pontiac, paying for both, and bought a 1956 Ford or Chevrolet on November 16, 1960. She said that she used her own money in these purchases, except for one occasion when the money was furnished by

her father-in-law.

She was not divorced from Higginbotham until July 1962. She lived with her father most of the intervening time. Mrs. Montgomery admitted that she wrote the Veterans' Administration asking an investigation about the proceeds of the estate several years before her father's death. Although she stated in a letter written to the same agency after her father's death that she had dropped the matter on the advice of her father's attorney, she testified that she dropped the claim because she was told to do so by her father. She says that she thought that her father would give her the money. She offered no other excuse for her delay in asserting the fraud she now claims.

It is significant that on January 26, 1960, Mr. Balch executed a deed to the Cherokee Courts to appellant. On the same date, appellant admits having executed a mortgage on the property for $12,000. The mortgage contained a recitation that the debt was a part of the purchase money for the property. Both instruments were acknowledged before Donald E. Smith. The records of the Newport Federal Savings and Loan Association showed that Certificate No. 476 was issued to Balch as guardian of his daughter on November 28, 1951. The ledger sheet on that certificate showed that it was surrendered on November 1, 1959. These records further reflected that Certificate No. 1543 for the sum of $10,-000 was issued to Florence Carolyn Balch on November 1, 1959, and canceled on January 26, 1960. On the same date Certificate No. 1622 was issued to L. G. Balch and canceled on July 1, 1960. On April 5, 1960, appellant deeded the Cherokee Courts property to E. L. and Maurice McCarty. The deed stated the assumption of the mortgage to L. G. Balch for $12,000 by the McCartys. On the same date, the McCartys conveyed certain property in Mississippi County, Arkansas, to appellant. This transaction was pursuant to a contract of March 5, 1960, between appellant and E. L. McCarty. This agreement

provided for the conveyance of a theater, cafe and apartment building in Mississippi County to appellant and the payment by McCarty of a total of $14,000, of which $12,000 was to be by assumption of the Balch mortgage on the Cherokee Courts. The consideration for this agreement by McCarty was the conveyance of the Cherokee Courts property to McCarty.

Appellant's explanation of these transactions is that her father asked her and Higginbotham to take over the Cherokee Courts and operate them for him. She stated that he told her he would forgive their payment of the loan if she would do him this favor. She admitted having executed the instruments in January of 1960 before Don Smith at the Cherokee Courts, but said that she was ill, had been taking shots for pain, and had been asleep when Mr. Smith brought the papers to the Cherokee Courts. She stated that no one explained the papers to her and that she thought that they were simply for the purpose of her running the courts while her father was gone to aid her brother in a business in St. Louis. Although the bank account for this business was carried in the name of Cherokee Courts and checks drawn by appellant and her husband, her explanation was that her father told her to deposit money in the bank, draw on it for bills and for her living and to send him money when he called. She claimed that she did send him money in bills or by money order. She testified that, after payment of costs, her living expenses, and sending money to her father, there was no money left. She also claimed that the sale of the courts to McCarty and the purchase of the cafe and other properties in Mississippi County were made by her father. She admitted having called on McCarty, but said that she quoted no price or terms to him and told him that her father would contact him. Later, she said that her father called and told her to execute the papers for the transaction. Her father then asked her if she would run the cafe, as she had the motel, according to her version. Later she went to Mississippi with her husband,

where they bought some real property. She said that she paid somewhere between one and two thousand dollars for this real estate, by use of her husband's military allotment. She admitted on cross-examination that she received a check for $2,000 from McCarty for the cash payment in the transaction, but on redirect examination her memory of this payment was faulty. She said that she did go to Mississippi County and operate the cafe business but that her father sold it.

Donald E. Smith testified that he went to the motel on January 26, 1960. He said that Mr. Balch gave him the deed, mortgage and certificate of deposit and that he presented them to appellant. According to him, he handed her the savings and loan certificate and told her she was to endorse it and he was to witness it. The deed and mortgage had been prepared by Ben H. White, an officer of the savings and loan association.

It is obvious that all of the facts were well known to her or could have been ascertained many years before her father's death. Long ago, this court held in *Walker v. Norton,* 199 Ark. 593, 135 S.W. 2d 315, that an accounting by a personal representative would not be ordered where the complainant was guilty of laches, especially where the difficulty of doing entire justice arises through the death of principal participants or of witnesses or lapse of time. Clearly this is a case which calls for the invocation of this rule. Certainly this appellant was mature enough and far enough removed from the influences of her father during the six-year period that he lived after the closing of the guardianship to have asserted the fraud she now claims. During this period of time she had been married three times and on at least one occasion lived with her husband's parents. It seems obvious to us that this action was motivated because her father was silenced by death. Under these circumstances we find that she was not entitled to any equitable relief. See *George* v. *Serrett,* 207 Ark. 568, 182 S.W. 2d 198. To grant her relief would require that

we disregard the solemn orders of the probate court and every written record involving transactions between appellant and her father.

It would unduly extend this opinion to outline evidence not hereinabove mentioned. It is sufficient to say, however, that the preponderance of the evidence is against a finding of fraud in this case, even if we should disregard the defense of laches.

The decree is affirmed.