Richard B. BISHOP *v.* LINKWAY STORES, INC.,
ARKANSAS CREDIT COUNCIL, S. T. (Ros) SMITH,
Bob WIMBERLY, and ARKANSAS RETAIL
MERCHANTS ASSOCIATION

83-119                                    655 S.W.2d 426

Supreme Court of Arkansas
Opinion delivered July 11, 1983
[Rehearing denied September 12, 1983.*]

*HICKMAN, J., and RHODES and HATFIELD, Special JJ., would grant rehearing.

*J. H. Cottrell,* for appellant.

*Jack Young* of *Laser, Sharp, Haley, Young & Hucka-bay,* for appellee Linkway Stores, Inc.

*James M. McHaney* and *James M. McHaney, Jr.* of *Owens, McHaney & Calhoun,* for appellees Arkansas Credit Council et al.

*Jim Guy Tucker* of *Mitchell, Williams, Selig, Jackson & Tucker,* for appellee Arkansas Retail Merchants Association.

RICHARD B. ADKISSON, Chief Justice. This case questions the amount of interest that can be charged on consumer loans and credit sales under Section 13, Article XIX of the Arkansas Constitution as recently amended by Amendment 60. Appellant, Richard B. Bishop, purchased from appellee, Linkway Stores, Inc., certain items of furniture for his home, executing in part payment a conditional sales contract providing for an interest rate of 15 percent per annum on the unpaid balance. Appellant later filed suit, alleging that the contract was usurious. Appellant contended that since the Federal Discount Rate was 8.5 percent on the date of the transaction, the maximum allowable rate of interest on the contract was 5 percent over the Federal Discount Rate, or 13.5 percent. Appellees, Arkansas Credit Council and Arkansas Retail Merchants Association, intervened and after a trial the Pulaski County Chancery Court held that the conditional sales contract was not usurious and that Section 13 (a) was not applicable to consumer loans and credit sales. On appeal we reverse.

As approved by the electorate, Amendment 60 provides:

BE IT RESOLVED BY THE HOUSE OF REPRE-
SENTATIVES, AND BY THE SENATE, OF THE
SEVENTY-THIRD GENERAL ASSEMBLY OF
THE STATE OF ARKANSAS, A MAJORITY OF
ALL MEMBERS ELECTED TO EACH HOUSE
AGREEING THERETO:

THAT the following is hereby proposed as an amendment to the Constitution of the State of Arkansas, and upon being submitted to the electors of the State for approval or rejection at the next general election for Representatives and Senators, if a majority of the electors voting thereon at such election adopt such amendment, the same shall become a part of the Constitution of the State of Arkansas, to wit:

SECTION 1. Section 13, Article XIX, of the Arkansas Constitution of 1874, is hereby amended to read as follows:

'Section 13. (a) General Loans:

(i) The maximum lawful rate of interest on any contract entered into after the effective date hereof shall not exceed five percent (5%) per annum above the Federal Reserve Discount Rate at the time of the contract.

(ii) All such contracts having a rate of interest in excess of the maximum lawful rate shall be void as to the unpaid interest. A person who has paid interest in excess of the maximum lawful rate may recover, within the time provided by law, twice the amount of interest paid. It is unlawful for any person to knowingly charge a rate of interest in excess of the maximum lawful rate in effect at the time of the contract, and any person who does so shall be subject to such punishment as may be provided by law.

(b) Consumer Loans and Credit Sales: All contracts for consumer loans and credit sales having a greater rate of interest than seventeen percent (17%) per annum shall be void as to principal and interest and the GeneralAssembly shall prohibit the same by law.

(c) Definitions: As used herein, the term:

(i) 'Consumer loans and credit sales' means credit

extended to a natural person in which the money, property, or service which is the subject of the transaction is primarily for personal, family, or household purposes.

(ii) 'Federal Reserve Discount Rate' means the Federal Reserve Discount Rate on ninety-day commercial paper in effect in the Federal Reserve Bank in the Federal Reserve District in which Arkansas is located.

(d) Miscellaneous:

(i) The rate of interest for contracts in which no rate of interest is agreed upon shall be six percent (6%) per annum.

(ii) The provisions hereof are not intended and shall not be deemed to supersede or otherwise invalidate any provisions of federal law applicable to loans or interest rates including loans secured by residential real property.

(iii) The provisions hereof shall revoke all provisions of State law which establish the maximum rate of interest chargeable in the State or which are otherwise inconsistent herewith.'

SECTION 2. The ballot title for this amendment shall be:

An Amendment to Section 13 of Article XIX of the Constitution of the State of Arkansas to Control Interest Rates and Set the Penalty for Violations Thereof.

SECTION 3. The popular name for this amendment shall be:

The 1982 Interest Rate Control Amendment.

It is well settled that when a constitutional amendment or a statute is plain and unambiguous, there is no room left for judicial construction, and neither the exigencies of a case, nor a resort to extrinsic facts will be permitted to alter the meaning of the language used in the statute. *Cunningham* v. *Keeshan,* 110 Ark. 99, 161 S.W. 170 (1913); *Berry* v. *Sale,* 184 Ark. 655, 43 S.W.2d 225 (1931). As here, where the meaning of an act or constitutional amendment is clear and unambiguous, this Court is primarily concerned with what the document says, rather than what its drafters may have

intended. *See City of Little Rock* v. *Arkansas Corp. Commission,* 209 Ark. 18, 189 S.W.2d 382 (1945).

The language used in Amendment 60 is clear and unambiguous, and we have no authority to construe the amendment to mean anything other than what it says. Section 13 (a) (i) provides that the "maximum lawful rate of interest on *any* contract" (emphasis ours)' shall not exceed 5 percent per annum above the Federal Reserve Discount Rate at the time of the contract. The word "any" means exactly what it says, and a consumer loan certainly falls within the category of "any contract."

Section 13 (b), when read in conjunction with Section 13 (a), provides for a further limitation on interest rates but is applicable only to consumer loans and credit sales. Section 13 (b) specifically limits the maximum interest rate on such loans to 17 percent. These separate subsections are in no way conflicting and each has its own penalty for violations.

It is clear, therefore, that the provisions of Amendment 60 have a two-fold limitation on the maximum amount of interest a lender can charge on a consumer loan or credit sale — the lesser of 17 percent or 5 percent over the Federal Reserve Discount Rate. Here, since this contract has a rate of interest in excess of the lawful rate provided for under Section 13 (a), it is void as to the unpaid interest as provided by Section 13 (a) (ii).

Reversed.

HOLT and HAYS, JJ., not participating.

RICHARD F. HATFIELD and JAMES R. RHODES, III, Special Justices.

HICKMAN, J., and HATFIELD and RHODES, Special JJ., dissent.

RICHARD F. HATFIELD, Special Justice, dissenting. I would affirm the Trial Court's decision, since its interpretation is in keeping with the wording and intent of

Article XIX, Section 13, of the Constitution of Arkansas as amended by Amendment 60.

Since the opinion of Judge Bullion, the Trial Judge, expresses so well the proper construction we should give to the Amendment, it is attached verbatim as an addendum to this opinion.

In summary, I feel that the majority errs in two respects:

1. It fails to properly consider the *entire* document and give meaning to each word by concentrating on the wording of Section 13 (a) (i), and,

2. It views Amendment 60 too strictly and, in a sense, in a *vacuum*. Since it finds no ambiguity in the document, it does not consider the *history* of the times and voters' intent in passing Amendment 60. Furthermore, their construction does not, in my judgment, follow the plain meaning of Amendment 60 when this history is examined.

Confronted with the proffer of voluminous evidence, the Trial Court held:

> "When the history of our times leading up to and during the formation and adoption of Amendment 60 is noticed and when the spirit of this law is given credence, the answer falls into place so solidly there can be no doubt of this answer. With this full consideration, it is plain that the resulting absurdities, conflicts and contradictions of the acceptance of Plaintiff's argument would defeat the plain purpose of Amendment 60. And, to reach such an obviously required result, it is proper to modify, reject and/or substitute words and phrases in Amendment 60 to give it this intended meaning."

Amendment 60 is susceptible of more than one interpretation and, thus, should not be interpreted in a vacuum. To properly construe it requires careful analysis of the relevant evidence of the problem it was meant to solve, the process by which it was drafted, the declaration of its

meaning to the voters through the media when, as reflected by the record, only one interpretation was presented and the logical effects of the construction given. Amendment 60 was passed by voters who wanted a sound economic climate which had, due to economic conditions and the harsh penalties of our usury law, diminished greatly. They were clearly voting for better economic times. It is difficult to conceive that they voted for more uncertainty as to interest rates, more litigation as to this area of law and more complex credit arrangements. Extrinsic evidence revealed this clearly and was necessary for proper construction, which I feel the Trial Court made.

The proper interpretation of Amendment 60 should be determined by the following rules of statutory construction:

1. Viewing the document in its entirety;

2. Considering the history of the times, voter intent and the objective to be accomplished by it;

3. If Amendment 60 is ambiguous, admitting extrinsic evidence to assist in its construction;

4. Construing Amendment 60 to carry out its intent as revealed from *all* its words with consideration of the logical results of this construction.

I feel the Trial Court correctly applied these principles to the facts for the following reasons:

First, the majority has not given meaning to the entire Act as did the Trial Court in its opinion set forth herein. *Chism* v. *Phelps,* 228 Ark. 936, 311 S.W.2d 297, 77 ALR2d 329 (1958), *Sargent* v. *Cole,* 269 Ark. 121, 598 S.W.2d 749 (1980), *Commercial Printing Co.* v. *Rush,* 261 Ark. 468, 549 S.W.2d 790 (1977). The essence of the majority opinion is to ignore those types of contracts not within the definition of "General Loans," but clearly treated separately in paragraphs (b) and (d). Focusing on one paragraph violates the rule requiring the entire document to be construed, and, in this regard, the Trial Court said:

"The first source the court must look to in the resolution of this problem is the total pertinent language of the instrument considered. This inquiry must go beyond isolated words, phrases or even paragraphs for an analysis of the result the various interpretations bring about to the entirety of the document. If the result of one interpretation brings about greater disharmony in the entirety, then that should not be accepted, for absurd, conflicting and contradictory results should not be imputed to be intentional.

. . . . .

"This interpretation of Amendment 60 gives the intended force and effect to each subsection heading, i.e.: 13 (a) text relates to General Loans; 13 (b) text relates to Small Loans; 13 (c) text relates to definitions of material in 13 (a) and 13 (b); and 13 (d) text relates to that which is Miscellaneous to 13 (a), 13 (b) and 13 (c), but thought needed to round out the total categories of lending transactions.

. . . . .

"If, as Plaintiff urges, the word "any" means "all", the result is further conflict with the two types of lending categories identified in 13 (d). Actually, the word "conflict" is incorrectly used as the language of those two transactions makes it very clear that neither the floating nor the fixed rates of interest apply to them. But, they are lending transactions, and would be included within the meaning of the word "all", as Plaintiff attempts to apply it. The fact that these miscellaneous types of lending transactions are excluded from the floating and fixed interest rates is proof positive that the word "any" does not mean "all". That being so, how much less than "all" shall the interpreter tone down "any"? A half note, a quarter note, or what? The plain fact is that the argument of Plaintiff, when afforded a little more than a superficial look, is but straining at a gnat. If the interest rate provisions of 13

(a) and 13 (b) are commingled, the intent of Amendment 60 is frustrated."

. . . . .

Second, the Trial Court considered the objective to be accomplished by Amendment 60, which the majority fails to do. *May* v. *McCastlain*, 244 Ark. 495, 426 S.W.2d 158 (1968). *Cheney* v. *Georgia-Pacific Paper Corp.*, 237 Ark. 161, 371 S.W.2d 843 (1963). A proper analysis would reveal that consumer loans should be the same as under the old Amendment (10% interest limit) except that the interest rate limit is now 17%. This is simple and understandable to those obtaining consumer credit and continues time-tested credit procedures. The majority's decision can only result in confusion and frustration on behalf of the consumer and, inevitably, more litigation.

Third, voter intent or the spirit of Amendment 60 must be kept paramount, in consideration of its construction, with a liberal view to carry out this intent. *Henderson* v. *Russell*, 267 Ark. 140, 589 S.W.2d 565 (1979). *Bailey* v. *Abington*, 201 Ark. 1072, 148 S.W.2d 176 (1941), *Ragsdale* v. *Hargraves*, 198 Ark. 614, 129 S.W.2d 967, *Carter* v. *Cain*, 179 Ark. 79, 14 S.W.2d 250 (1929). A study of the history of the time preceding voter approval is necessary to interpret Amendment 60. A cure for credit problems resulting from the harsh results of the old Amendment combined with existing economic conditions was desired. The analysis of this history shows the Trial Court's decision was certainly in keeping with its stated and published purposes.

Fourth, extrinsic evidence should be considered, since the wording of Amendment 60 is susceptible to more than one meaning. *May,* supra. Furthermore, such evidence brings life to the words used. By finding no ambiguity in its language, the majority does not reach this issue. However, I feel that ambiguity does exist and extrinsic evidence is admissible to show voter intent.

The question then arises as to the type of such evidence which is admissible.

The record of legislative history in the form of minutes of meetings of the Joint State Agencies and Governmental Affairs Committee of the General Assembly should certainly be considered. *Hartford Fire Ins. Co.* v. *State,* 76 Ark. 303, 89 S.W. 42 (1905). So also are the acts of the General Assembly as Amendment 60 was drafted and referred to the voters. *Cheney,* supra. *U.S.* v. *Missouri Pacific Railroad Co.,* 278 U.S. 269, 49 S. Ct. 133, 73 L.Ed.2d 322, affirming 21 F.2d 351 (1927). *Callahan* v. *L.R. Distributing Co.,* 220 Ark. 443, 248 S.W.2d 97 (1957). The evidence reveals in detail the compromise among representatives of interested parties such as labor, retail businesses and banking, which brought about a change in wording of the Amendment to its final form.

While the opinions of a legislator as to *his* understanding of the meaning of proposed legislation is not admissible, testimony of legislators recorded in the minutes of the committee meetings and other legislative sessions are entitled to consideration, as they are statements of public events. *Wiseman* v. *Madison Cadillac,* 191 Ark. 1021, 88 S.W.2d 1007 (1935). The problems that gave rise to Amendment 60, possible consequences of various considered proposals and discussion as to the effects of the final wording of Amendment 60 as finally approved are also admissible. *Hartford Fire Insurance Co.,* supra.

Furthermore, judicial notice is permitted by Rule 201, Rules of Evidence, of "facts capable of accurate and ready determination by resort to resources whose accuracy cannot be questioned." In any event, these statements were subject to examination by opposing counsel's proffer of evidence to the contrary. But they remain *facts* discussed in formulation of Amendment 60, and are thus relevant in determining its intent. Here the testimony of views of legislators as to the possible effect of various proposals and of the probable effect of the final wording in Amendment 60 should be considered. This testimony made clear that the intent of Amendment 60 was to create a class of consumer credit exactly like Article 19, Section 13, as it was then worded, except to raise the interest rate from 10% to 17%. There was discussion of the opposition to a floating rate and the reasons for such opposition. These are opinions, but are also predictions of

the effect of proposed wording and the reasons for positions taken which contribute to an understanding of the final wording of Amendment 60. It clearly reveals that the meaning was clear in the matters covered in the record of the hearings. Certainly, evidence as to the fallacies of such arguments to show their weakness could have been presented. Also in this regard, the explanation by Rep. Stewart to the House of Representatives was relevant as to the intended meaning given to those voting on the wording of Amendment 60.

Although we have, up to now, denied admission of evidence of the draftsmen of an Amendment, such evidence has support elsewhere where the reasons for the act are communicated to the legislature. 2A Sutherland, *Statutes and Statutory Construction* § 48.12 (Sands 4th Ed.). Other states have also adopted this view. *Railroad Roofing & Building Supply Co.* v. *Financial Fire & Casualty,* 171 N.J. Super 375, 409 A.2d 300 (1979); *American Waterways Operation, Inc.* v. *U.S.,* 386 F.Supp. 799 (D.D.C. 1979).

*Liberal* views of evidence should be taken in statutory construction. *Henderson,* supra; *Bailey,* supra; *Ragsdale,* supra; *Carter,* supra. Relevant evidence should be considered as it relates to communication *to* those preparing legislation in adopting the wording. Such was the case here, since it gives meaning to the words used and should be considered by this Court. In this case, an abundance of evidence corroborates the testimony of the legislators, and an ironclad rule forever banning such evidence can only result in a warped interpretation of the legislators' intent.

The trends in the Rules of Evidence coincide with proper rules in the area of statutory construction. All relevant evidence should be admitted within the limits set forth in the Rules of Evidence and be subjected to the test of validity by cross-examination and the introduction of evidence favoring an opposing view. Is relevant evidence any more important than when it shows a concept such as the "history of the times" or the "spirit of the Act"?

Newspaper articles and media broadcasts, considered hearsay under Rule 801, Rules of Evidence, can be admitted

as an exception under Rule 803 (24), Rules of Evidence, since they are relevant and can be tested by other evidencing and opposing counsel's examination. Such articles are vitally important here to show the "history of the times" and *what* was communicated to the voters concerning Amendment 60. Important in this regard and a further reason for admission is that the record reflects that only *one* interpretation was placed on the effect of Amendment 60 as to consumer rates, *i.e.*, that they would be no more than 17%. *No* contrary evidence appeared in the record. Surely this is relevant in interpreting voter intent in approving Amendment 60.

The majority should view *Hodges* v. *Dawdy*, 104 Ark. 583, 149 S.W.2d 656 (1912), in light of the changes in the approach to Rules of Evidence and the means of dissemination of information through the media occurring since 1912, when it was decided, and either reverse it or restrict its application. Such an approach would allow for a realistic presentation of the meaning to "history of the times" surrounding a proposed Act, and the information furnished to the voters on a proposal.

The result of the majority's decision will be to *frustrate* the intent of Amendment 60 as expressed by the voters. Obtaining consumer credit in a relatively simple transaction at a rate of up to 17% will not be widespread. Thus, many of the problems of obtaining consumer credit will be as pronounced as before the passage of Amendment 60.

An in-depth consideration of all relevant evidence in determining the purpose of Amendment 60 as read in its entirety leads to the conclusion that the Trial Court correctly construed it.

I would affirm the Trial Court.

I am authorized to state that Special Justice JAMES RHODES and HICKMAN, J., join in this dissent.

## ADDENDUM

"This case involves a question that requires an interpretation of Amendment 60 to our Constitution (60),

adopted by the people at the General Election in November, 1982. It amended Article 19, Section 13, (19/13), the usury provision that limited the maximum lawful interest rate in Arkansas to 10% per annum, absent federal law override. The interpretative question presented is whether, under the language of 60 that relates to "Consumer Loans and Credit Sales" (Small Loans), they are to be limited to the lesser of two interest rates set out therein, to-wit: (1). Section 13 (a) (i), "5% per annum above the Federal Reserve Discount Rate (FRDR) at the time the contract is made;" and (2). Section 13 (b), "17% per annum".

. . . . .

"Thus is presented to the court the typical problem that requires a written instrument to be interpreted as to its intent, where its language may possibly be susceptible to more than one meaning. Into such a task as this is the problem of trying to determine the intent of those who framed it and those who adopted it into the body of our law (in this instance the voters are the lawgivers), and to resolve this purpose the courts inquire into several sources of possible information.

"At the outset of this discussion, I am faced with an almost impossible evidentiary task, due to a lack of sufficient time to devote to the problem, except by way of compromise with myself, which I conclude is a satisfactory result. Ds, at trial, attempted to introduce into the evidence an inordinate amount of printed material, asserting that it has great bearing upon the issue of intent of those who framed 60, and of those who voted upon 60. This material, in a general way, consists of: affidavits of Legislators who were present in Committee hearings, and later when the measure was voted upon by the 73rd General Assembly; affidavits of attorneys involved in the actual drafting of 60 into its final form, and who presented it to the Joint Legislative Committee; a TV videotape and a transcript of another broadcast of the presentations, pro and con, to the Joint Committee hearing when 60 was approved for Legislative vote (it was then designated HJR 7); news clippings and articles (one by Dr. R. A. Leflar) published, and otherwise disseminated to the

public prior to the General Election of 1982, which report and observe on the content of 60, pro and con; samples of campaign literature by the proponents and opponents of 60, that relate to its content; etc.

"P objected to the receipt in evidence of all of this material upon two grounds; (1). that some of it contains hearsay statements (Rule 801, et seq., Uniform Rules of Evidence); and (2). that this material is not relevant (Rule 401, et seq. URE). This latter objection is based upon, says P, pronouncements of our Supreme Court in the cases of *Hodges* v. *Dawdy*, 104 Ark. 583 (1912); *Wiseman* v. *Madison Cadillac Co.*, 191 Ark. 1021 (1935); and *Atkinson* v. *Board*, 1977, 262 Ark. 552."

. . . . .

"It is the argument of Ds, in urging that this material is relevant to the issues of this case, that: (1). the advent of modern communication devices make *Hodges* and *Wiseman* out of date, citing: *Client Follow-Up Co.* v. *Hynes*, 390 N.E.2d 847 (Ill. 1979); 2A Sutherland, *Statutes and Statutory Construction*, Sec. 48.19 (Sands 4th Ed.); *In re Quinn*, 35 Cal.App.3d 483, 110 Cal. Rptr. 881 (1973); *Amalg. Assn.* v. *Las Vegas*, 202 F.Supp. 726 (DC-Nev., 1962); and *Chamberlain, Inc.* v. *Andrews*, 286 N.Y.S. 242, 159 Misc. 124 (1936), in support of this observation; and (2). that neither *Hodges, Wiseman* nor *Atkinson* have application to the case at bar. Ds point out that those cases are concerned with the problem of debates, or expressed opinions, as to the meaning of document language, that arose prior to the election or vote; whereas in this instance, there never was a debate, or question, even beyond the General Election of 1982, that arose on the problem presented in this suit; that the floating rate and the fixed rate were, at all times, presented as separate and distinct, one from the other, and without interrelation, and that this mass of material will establish this as an unquestioned fact by both the proponents and the opponents of 60. P does not deny this argument of Ds.

"Assuming that this is the content of this material, for purposes of my compromise (and I have no reason to doubt

that Ds assert correctly), I must agree that this material should be received in evidence for the purposes explained, and given some consideration in this search for the intended meaning of the language of 60. Most assuredly it is not conclusive of the problem, only some weight in its final resolution. Therefore, and over the objection of P, this material will be received into the evidence subject only to the hearsay objection of P, which is sustained.

"However, I have concluded that this problem can be resolved by an analysis of 60, without outside interpretative aids such as the evidentiary matter just discussed. And, when the history of our times leading up to, and during the formation and adoption of 60, is noticed, and when the spirit of this law is given credence, the answer falls into place so solidly there can be no doubt of this answer. With this full consideration, it is plain that the resulting absurdities, conflicts and contradictions of the acceptance of P's argument would defeat the plain purpose of 60. And, to reach such an obviously required result, it is proper to modify, reject and/or substitute words and phrases in 60 to give it this intended meaning. (R. 65)

. . . . .

"The first source the court must look to in the resolution of this problem is the total pertinent language of the instrument considered. This inquiry must go beyond isolated words, phrases, or even paragraphs, for an analysis of the result the various interpretations bring about to the entirety of the document. If the result of one interpretation brings about greater disharmony in the entirety, then that should not be accepted, for absurd, conflicting and contradictory results should not be imputed to be intentional.

. . . . .

"When one studies 60 in such a way, it is readily ascertainable that its purpose is to accomplish six separate functions: (1) it classifies all lending transactions into four categories, to-wit: (a) General Loans; (b) Small Loans; (c) loans upon which no rate of interest has been agreed upon;

and (d) loans controlled by federal law, including those secured by residential real property; (2) it establishes two rates of interest applicable to the lending transactions described in 13 (a) and 13 (b); (3) it establishes two separate penalties for the act of usury, divided into separate sections and accompanying the texts of the two distinct interest provisions; (4) it specifically defines Small Loans; (5) by the process of elimination, it defines General Loans; and (6) it defines FRDR.

. . . . .

"Keeping these principles in mind, the argument of P is examined in the light of the syllogism set out above. It is observed that P seeks to impose, or transpose, the text of 13 (a), which bears the topic heading "General Loans", upon the text of 13 (b), which bears the topic heading "Small Loans", or vice versa, and the argument actually merges the two sections into one. In effect it destroys all need for the two categories of lending transactions, or for the two sections 13 (a) and 13 (b). The format of 60 is then out of harmony with its obvious intent. Not only is that so, but it creates conflicts, confusion, ambiguities and absurdities that no court, in good conscience, should conclude was the intent of its framers, the Legislature, or the voters. For instance, and using the false conclusion of P, arguendo:

"1. It results in two distinct penalties for an usurious act in the case of Small Loans, of such wide degree of impact, it is absurd. That is, if the usurious act exceeds the floating rate, but is less than the fixed rate (as here), the penalty is loss of unpaid interest, plus twice the amount of interest paid (here, a total amount of $92.26). The debt remains due and owing. Whereas, and using this case as the example, had the interest charge been 4% per annum higher, making the total charge 17.5% per annum (a few dollars more than the 13.5%), the total debt of $750.72, plus all unpaid interest, is the penalty. The unpaid balance and the interest is cancelled. Such a frivolous result could not have been the intent of 60.

. . . . .

"The phrase "maximum lawful rate", appearing in 13 (a) (i), is written twice more in 13 (a) (ii), a clear indication that the two paragraphs are interwoven in meaning; whereas, that phrase does not appear at all in 13 (b), a good indication to say the least, that the subject matter of 13 (a) and 13 (b) are separate and distinct one from the other.

"2. The acceptance of the interpretation urged by P results in the requirement that the 13 (a) topic heading "General Loans" either be ignored or revised. If Small Loans are merged into the provision of 13 (a) (i), so as to make it read:

"The maximum lawful rate of interest on General and Small Loans shall not exceed 5% above the FRDR . . . "; or,

"The maximum lawful rate of interest on all contracts . . . shall not exceed 5% . . . above the FRDR . . . ";

the topic heading "General Loans" is no longer truly descriptive of the text material of 13 (a). This topic heading was, and is, included in the format of 60 for some purpose, and to make sense of the format of 60, as written, General Loans must be said to describe "any contract", or vice versa. If "Any contract" is converted to mean "all contract", "General Loans" thereupon becomes descriptive of "General and Small Loan contract", which is actually a confusing, contradictory and ambiguous result. And so it is, that one is forced into the position of either ignoring the topic heading, or revising it to read "General and Small Loans". Either course would take unwarranted liberties with the language of 60, and violates well-known rules of interpretation that every word, phrase, sentence used in an instrument must be afforded some meaning, if at all possible.

.    . . . . .

"3. The manner in which a written instrument is structured, and punctuated, is often of valuable assistance in an interpretation of its intent. The separation of written

instruments into separate paragraphs, or sections, has already been discussed and will not be repeated except to point out once again that each of the four lettered subsections of Section 13 begin with a topic heading with ensuring text material that relates to each specific topic heading.

"The argument of P requires the court to ignore the value and meaning of the punctuation of 60. Each topic heading in the four sections is followed by the punctuation mark "colon", a mark, or symbol, invented for use in writing to denote a pause in the thought being expressed. Using 13 (a) as the illustration, it is written and punctuated as follows:

"Section 13. (a) General Loans:

"(i) The maximum lawful rate of interest . . .

"(ii) All such contracts . . . "

After the colon pause of the topic heading, the text material that ensues relates to the permissible interest rate and penalty for overcharges. Proper interpretation requires that the interest rate and penalty texts must relate to the topic heading. So, and in the final analysis, the addition of the word "such" in the phrase "any contract" is nothing more than a clarification of the clearly written intent of 60.

"This interpretation of 60 gives the intended force and effect to each subsection heading, i.e.: 13 (a) text relates to General Loans; (13) (b) text relates to Small Loans; (c) text relates to definitions of material in 13 (a) and 13 (b); and 13 (d) text relates to that which is Miscellaneous to 13 (a), 13 (b) and 13 (c), but thought needed to round out the total categories of lending transactions.

"4. If, as P urges, the word "any" means "all", the result is further conflict with the two types of lending categories identified in 13 (d). Actually, the word "conflict" is incorrectly used as the language of those two transactions makes it very clear that neither the floating nor the fixed rates of interest apply to them. But, they are lending transactions,

and would be included within the meaning of the word "all", as P attempts to apply it. The fact that these miscellaneous types of lending transactions are excluded from the floating and fixed interest rates is proof positive that the word "any" does not mean "all". That being so, how much less than "all" shall the interpreter tone down "any"? A half note, a quarter note, or what? The plain fact is that the argument of P, when afforded a little more than a superficial look, is but straining at a gnat. If the interest rate provisions of 13 (a) and 13 (b) are commingled, the intent of 60 is frustrated.

. . . . .

"The wording and structure of the whole of 60 leaves no doubt but that its intent is to create a separate and distinct lending category, entitled "General Loans" in Section 13 (a) thereof, and that the text material of this subsection is intended to apply and relate only to that topic heading, and to none other; and to create a separate and distinct lending category, entitled "Small Loans" in Section 13 (b) thereof, and that the text material of this subsection is intended to apply and relate only to that topic heading, and to none other.

. . . . .

"And thus it is that an examination of the entirety of 60, and a superficial look at the history of our times and the events leading up to 60, results in a finding that the conclusion of P, in the syllogism suggested above, is a non sequitur. Except for its superficial appearance, it is clear that the interest rate and penalty provision for excessive charges in 13 (a) relate only to General Loans, and to none other; and that the interest rate and penalty for excessive charges set forth in 13 (b) relate only to Small Loans, and to none other."

Supplemental Opinion delivered July 18, 1983

PER CURIAM. In this case we must once again express our disapproval of the conduct of an attorney who testifies in a case while also acting as an attorney in the case. *Rushton* v. *First Nat. Bank of Magnolia,* 244 Ark. 503, 426 S.W.2d 378 (1968); *Old American Life Ins. Co.* v. *Taylor,* 244 Ark. 709, 427 S.W.2d 23 (1968); *Montgomery* v. *First Nat. Bank of Newport,* 246 Ark. 502, 439 S.W.2d 299 (1969); *Watson* v. *Alford,* 255 Ark. 911, 503 S.W.2d 897 (1974); *McWilliams* v. *Tinder,* 256 Ark. 994, 511 S.W.2d 480 (1974); *Dingledine* v. *Dingledine,* 258 Ark. 204, 523 S.W.2d 189 (1975); *Canal Ins. Co.* v. *Hall,* 259 Ark. 797, 536 S.W.2d 702 (1976); *Jones* v. *Hardesty,* 261 Ark. 716, 551 S.W.2d 543 (1977); *Enzor* v. *State,* 262 Ark. 545, 559 S.W.2d 148 (1977); *Boling* v. *Gibson,* 266 Ark. 310, 584 S.W.2d 14 (1979).

In this case interventions defending the validity of the interest rate charged to the plaintiff were filed by Arkansas

Credit Council, represented by its own attorney, and by Arkansas Retail Merchants Association, represented by Jim Guy Tucker. Four days before filing the intervention Mr. Tucker had executed a 4-page affidavit detailing his personal knowledge of negotiations that had preceded the final drafting of Amendment 60. That affidavit was introduced by the Council at the trial and was relied upon in its brief in this court.

When the trial began, Mr. Tucker appeared and stated to the chancellor:

> Rather than running the risk regarding the admissibility of that affidavit, I ask the Court for permission to withdraw as counsel at this time and that Mr. Glenn Black be permitted to represent the Retail Merchants Association pro se in this proceeding.

The chancellor replied:

> Again, Mr. Tucker, certainly the Court will permit the withdrawal. I have a concern as to whether or not a corporation is capable of being pro se represented. If the gentleman is an attorney, in fact, as far as I am concerned he may go forward.

A trial brief was filed for Arkansas Retail Merchants Association, signed by its president, Glenn A. Black, who is not an attorney. Since most of that brief is repeated verbatim in Mr. Tucker's brief in this court, it appears that he or some member of his firm wrote both briefs.

Mr. Tucker also took part in the oral argument in this court. In response to a question about his being both a witness and an attorney in the case, Mr. Tucker expressed his awareness of the problem and defended his position by saying in part (as tape recorded at the time):

> Number one. I did not testify in this case. I did not even participate at the trial level.
> Number two. The affidavit of Jim Guy Tucker offered in evidence was not offered by my client.

We perceive no substantial difference between the situation of one who gives testimony in person and one who gives it by an affidavit. Both forms of sworn testimony fall within the reason for the prohibitory rule: "The roles of an advocate and of a witness are inconsistent; the function of an advocate is to advance or argue the cause of another, while that of a witness is to state facts objectively." Code of Professional Responsibility, EC 5-9, 33 Ark. L. Rev. 677 (1980).

At least three excerpts from our earlier decisions are directly pertinent:

An attorney who is to testify in an action should withdraw from the litigation. On the other hand, if an attorney is going to serve as an advocate for his client, he should refrain from testifying in the action. [*Enzor v. State, supra.*]

Any doubts about the application of these canons should be resolved by a declination of employment by any member of a law firm when a partner or associate may become a witness or by withdrawal of the firm from the representation when it becomes apparent that the testimony of a member or associate on behalf of a client will become necessary. [*Montgomery v. First Nat. Bank of Newport, supra.*]

Serving as appellate counsel after testifying is not even permissible. [*Boling v. Gibson, supra.*]

Justices Holt and Hays did not participate in the preparation of this per curiam opinion, nor did the two special justices who sat in the consideration of the case on its merits.