Larry BOLING, Special Administrator
*v.* Merna W. GIBSON and Cecil L. GIBSON

78-146                                           584 S.W. 2d 14

Opinion delivered July 9, 1979
(In Banc)

*Bradley & Coleman,* by: *Douglas Bradley,* for appellant.

*Moore & Gibson, P.A.,* by: *Michael L. Gibson,* for appellees.

JOHN A. FOGLEMAN, Justice. This appeal involves the title to eight certificates of deposit issued by various banks to Herman Gibson, Merna W. Gibson and Cecil L. Gibson. Merna W. Gibson (known as Wayne) and Cecil L. Gibson were the two sons of Herman, who died testate on October 12, 1976, bequeathing and devising all his property to these two sons, his only surviving children. Nora Gibson, Herman's widow, elected to take against the will, which had nominated these two sons (by a previous marriage) as joint executors. They were appointed as such by the probate court. Mrs. Gibson filed an objection to their accounting because it failed to account for certain certificates of deposit, which she alleged were property of the estate. She then filed an action in the chancery court to determine the ownership of the certificates, which the two sons claimed as a gift from their father. Larry Boling was appointed special administrator upon petition of Mrs. Gibson to prosecute actions on behalf of Herman Gibson's estate for the determination of the ownership of the certificates. The proceedings were consolidated for hearing. The chancellor and probate judge held that the certificates of deposit were the subject of a gift to Merna W. and Cecil L. Gibson, by their father. Appellant brings this appeal as to bank certificates of deposit of a total face value of $108,-038.14.

Appellant states the following point for reversal:

THE CHANCELLOR AND PROBATE JUDGE ERRED IN HOLDING THAT THE NON-NEGOTIABLE BANK CERTIFICATES OF DEPOSIT WERE A GIFT FROM HERMAN

GIBSON IN HIS LIFETIME TO HIS SONS MERNA W. GIBSON AND CECIL L. GIBSON.

A. THE BANK CERTIFICATES OF DEPOSIT WERE NOT SUBJECT MATTER TO CONSTITUTE A GIFT BY DELIVERY.

B. THERE WAS NO CLEAR INTENT TO MAKE AN IMMEDIATE PRESENT AND FINAL GIFT BEYOND RECALL, UNCONDITIONALLY RELEASING ALL FUTURE DOMINION AND CONTROL OVER THE CERTIFICATES OF DEPOSIT.

C. IF THE CERTIFICATES OF DEPOSIT WERE PROPER SUBJECT MATTER AND IF ALL THE ELEMENTS OF A VALID GIFT WERE PRESENT IN THE DELIVERY, IT PERPETRATED A FRAUD ON THE WIDOW.

A

Appellant contends that because these certificates of deposit were stamped "non-negotiable," and were not property but only representations of property or money held by banking institutions, they could not be the subject of a gift by the father who purchased them with his own money and either caused them to be made payable to him and these two sons or caused the certificates to be changed to include the two sons as payees, without ever having "designated in writing to the banking institution that the account or Certificate of Deposit is to be held in 'joint tenancy' " as provided in Ark. Stat. Ann. § 67-552 (a) (Repl. 1966). He somehow concludes that the issuing bank could not have legally paid the money to them on presentation of the instrument. He reads *Porterfield* v. *Porterfield,* 253 Ark. 1073, 491 S.W. 2d 48, as holding that a delivery of certificates of deposit issued in the names of two or more persons without a designation in writing will not satisfy the elements of an immediate, present and final gift. Such a reading is not justified. The decision in *Porterfield* was that there was no delivery of the certificate in question and no clear and convincing evidence that there had been a gift. We did hold that all the elements of a completed

inter vivos gift must be shown by clear and convincing evidence. We pointed out that there must be an actual delivery of the subject matter of the gift to the donee with a clear intent to make an immediate, unconditional and final gift beyond recall, accompanied by an unconditional release by the donor of all future dominion and control over the property so delivered.

The "non-negotiable" nature of these certificates meant only that title would not pass by endorsement and delivery by the payees, or any of them, to one not a party to the instrument. The alternate payees were the father and his two sons, named as "Herman Gibson or M. Wayne or Cecil Gibson," or variations of the names and of the order in which they were named. All were payable to any of the payees or the survivor of either. The sums represented by these certificates were payable by the issuing bank to any one of the three named payees. Ark. Stat. Ann. § 67-521 (Repl. 1976). *Cook* v. *Bevill*, 246 Ark. 805, 440 S.W. 2d 570. Ark. Stat. Ann. § 67-552 (a) has little, if any, significance, because appellees are not claiming by right of survivorship.

The certificates of deposit were subject of gift by delivery with intent to make a gift. We have said that a promissory note, or any chose in action or any other evidence of debt, may be the subject of a gift inter vivos. *Pyland* v. *Gist*, 177 Ark. 860, 7 S.W. 2d 985. A certificate of deposit falls into that category. It was classified in that respect in *Basket* v. *Hassell*, 107 U.S. 602, 2 S. Ct. 415, 27 L. Ed. 500 (1883) in these words:

> * * * A certificate of deposit is a subsisting chose in action and represents the fund it describes, as in cases of notes, bonds, and other securities, so that a delivery of it, as a gift, constitutes an equitable assignment of the money for which it calls.

These instruments have been so considered universally. *Commonwealth* v. *Crompton*, 137 Pa. 138, 20 A. 417 (1890); *Dietzen* v. *American Trust & Banking Co.*, 175 Tenn. 49, 131 S.W. 2d 69 (1939); *Philpot* v. *Temple Banking Co.*, 3 Ga. App. 742, 60 S.E. 480 (1908); Annot., 40 ALR 508, 509.

This contention presents us with a very difficult and delicate problem. Appellees sought to prove that a completed gift of the certificates of deposit was made to them by their father in his lifetime. They had the burden of showing, by clear and convincing evidence, that these certificates were delivered to them by their father with the clear intent to make an immediate, present, final gift beyond recall, releasing all future dominion and control. It must have been the intention of the donor that title pass immediately, and a delivery for safekeeping or for any purpose, either express or implied, other than a specific intent to part with all right, title and interest in, and all dominion and control over the certificates, would not constitute a gift. *Lowe* v. *Hart*, 93 Ark. 548, 125 S.W. 1030.

The certificates were issued by various banks in Jonesboro. None of the banks at the time required the depositor to designate the payees or depositers in writing or to execute any signature card or any written document in connection with the issuance to the certificates. Some of them had originally been issued to Herman Gibson only. Later, he caused the names of his two sons to be added as payees by oral instructions. Others were originally issued to these three payees. One of them had been issued as early as June, 1973. Appellees contend that the gift to them was made on July 28, 1976.

Mr. and Mrs. Herman Gibson had a safe deposit box at First Bank & Trust Company (then First National Bank) in Jonesboro. The records at that bank show that it was entered by Herman Gibson on July 28, 1976, at 9:05 a.m. Wayne Gibson, who lived in Springfield, Missouri, testified that he visited his father for two or three days in July, 1976, and that when the two ate breakfast on the morning of July 28, his father said, "We have got some business to take care of; we are going to town." Wayne said that, on the way, his father told him that he intended to give all the certificates of deposit he had bought, and about which he had talked to Wayne over the years, to Wayne and his brother, saying he wanted to take them out of his lock box and give them to Wayne. According to Wayne, they stopped at the First National Bank and his

father went inside and returned in a few minutes, handed Wayne an envelope containing the certificates and said, "These belong to you boys and I want you to have them," and then asked Wayne what he was going to do with them. Wayne said that they crossed the street and walked toward the Citizens Bank, but, before they got to the bank, his father met someone he knew and stopped to talk. Wayne proceeded into the bank and engaged a safety deposit box through Ms. Christobel Elliott, a bank employee, who gave him two keys to the box, and accompanied him to open the box, where he used one of the keys and she used the bank's key to open the box, into which Wayne placed the certificates. Wayne said that, as he left, he met his father, who was standing inside, near the front of the bank. Cecil Gibson testified that in June, 1976, his father had spoken of the certificates of deposit and had said to him, "I am going to give them to one of you boys, the first one of you that is up here on a working day."

This was all the testimony about the making of the gift, but a sharp issue has arisen about the intent of Herman Gibson at the time of the transaction and his relinquishment of dominion and control, particularly in view of the fact that he received and retained all interest paid on the certificates between the time they were placed in the lock box at Citizens Bank and his death.

Christobel Elliott, who was a vault attendant in charge of safety deposit boxes at Citizens Bank, had testified on behalf of appellant. She had been an employee of that bank for 13 years. She took Wayne Gibson's application for a lock box on July 28, 1976. She produced the record card for the box. She stated that, when Wayne Gibson came into the bank to rent the lock box, he told her his father, whom he identified as H. Gibson, would come in and sign the card, saying, "We will add his name to the card later, he does not have a key right now, I have both keys." She said that Wayne said that his father signed his name "H. Gibson." She said she had just handed Wayne the two keys to the box when he said this. She testified that a man who identified himself as Mr. H. Gibson came in a few days later and told her that his son Wayne Gibson had rented a lock box and had told him to come in and sign his name on the record card. She said that this man stated that he did not have a key yet, but he would be

transferring some things from First National Bank and wanted to get his name on the card, and that his son was going to give him a key. She permitted this man to sign the card because these statements seemed to her to be consistent with those made by Wayne Gibson when he rented the box. Her recollection when she testified was that Wayne had said something about transferring some things from the First National Bank. The signature on the card was clearly shown to be that of Herman Gibson, who signed "H. Gibson" on the card. The box was not entered between the time it was rented by Wayne and sometime after October 12, 1976, the date of Herman Gibson's death. Interest payments were made on each of the certificates of deposit after their delivery to Wayne Gibson by checks issued by the banks and made payable to the father and his two sons. These interest checks were endorsed by Herman Gibson only and his receipt and retention of the proceeds is not questioned.

Ms. Elliott testified that when she made the entry with reference to the transaction on her daily record, she listed the holder of the box as "Gibson, Wayne or H.," from the instructions given her by Wayne. This was done, according to her, prior to the time Herman Gibson came in to sign the card. She said that Cecil Gibson's name was added to the card on October 15, 1976, after Herman Gibson died. She said that some of the Gibsons came into the bank and tried to get the record changed, and that on one occasion, Wayne and Cecil Gibson came with their two attorneys, Moore and Gibson, and questioned her about the rental of the box and about H. Gibson's signature, intimating that she should not have let him sign the card, because she had no authority to do so. She said that, on another occasion, appellees came in and pretty much the same conversation took place. She said that M. W. Griffin and Terry Ray, her department heads, heard loud talking, realized that something was wrong, and came down where the parties were, and, after standing there a few minutes, called an attorney named Womack, who was a member of the law firm which represented the bank.

Christobel Elliott said that her discovery deposition had been taken twice. She said that when Moore took her discovery depositions, she produced a copy of the work sheet at his request and made it an exhibit to her testimony. She also

stated that he asked her to produce the card, a copy of which was made an exhibit to her discovery deposition. The receipt card, which she said was made up from her daily record sheet, showed payment by "Gibson, Wayne or H.," and computer cards she said were made from her daily record sheet listed the box in the name of "Gibson, Wayne or H." She also said that when her discovery deposition was taken on April 18, 1977, she was examined at length by attorneys Moore and Gibson about their coming into the bank and talking to her about the safety deposit box and, from her review of the deposition on the preceding day, there were references to both her meetings with the Gibsons. She stated that Moore had asked her if she was willing to take a polygraph or lie detector test.

On cross-examination, her credibility was immediately attacked. Ms. Elliott testified that Moore had questioned her as to how Herman Gibson's signature got on the card and indicated that she was not being truthful with him and asked her if it were possible that she had just imagined what she had said. She denied that she had told Moore and Gibson, the attorneys, that she did not know how Herman Gibson's name got on the card. She said that she had not stated to attorneys Moore and Gibson that she did not know how Herman Gibson's name got on the signature card or that she must have been away from her desk when it happened. She stated that in her earlier testimony, she denied having said that, but had instead said that one of the four (3 Gibsons and Moore) had said it. Otherwise, she repeated on cross-examination virtually the same testimony she had given on direct examination. She said that Herman Gibson's name was never typed in the upper left hand corner of the signature card where the names of persons who could enter the box for which the card was issued were normally placed, because he never came into the bank with a key. She said that she could not be mistaken about Wayne telling her his father would be in later. She said that she had noted on her work sheet that Wayne told her his father would be in later.

The attack on Ms. Elliott's credibility was continued aggressively. The first witness called by appellees was Tommy Womack, the attorney who had been called by bank officers. He testified that he had never been present in a conver-

sation with Ms. Elliott when the two attorneys were present, but was present when she was discussing the matter with appellees. He said that there was a disagreement between them at that time. On cross-examination, he said that Ms. Elliott's reputation in the community for truth and honesty was exemplary. It was then that Wayne Gibson testified. He contradicted Ms. Elliott's testimony, saying that she had told Moore in the presence of the three Gibsons that she did not know how Herman Gibson's name got on the card and said that it must have happened when a girl who replaced her might have been at her desk. He said that she also had said that the signature had not been authorized by Wayne.

Cecil Gibson corroborated his brother's testimony about Ms. Elliott's statements to them. He said that Ms. Elliott had given a deposition prior to trial that was different from what she had told appellees and their two attorneys, so he and Wayne went to the bank. He said that when a bank official saw they were running into a dispute, he called the lawyer. At the conclusion of Cecil Gibson's testimony, the following took place:

> MR. MOORE: If the Court please, I am going to testify. I will have to withdraw from the case.
> MR. BRADLEY: They would both have to withdraw from the case. * * * Rules of Ethics say that if even a partner testified the other partner has to withdraw.
> THE COURT: Gentlemen, I am not going to tell you how to try your lawsuit.
> MR. BRADLEY: I am not going to make any objections either way as such, I am merely pointing out what * * * Rules of Ethics says.
> MR. MOORE: There is no rule of law.
> MR. BRADLEY: I know there is no rule of law.
> THE COURT: As I said, gentlemen, I am not going to tell you how to try your lawsuit. I don't have that authority.

When Moore took the stand and identified himself, appellant's attorney stated: "If the Court please, just to be sure the record is straight, I want the record to show that Mr. Moore has withdrawn from the case to become a witness, but his partner is continuing in the lawsuit." The chancellor

responded: "All right." Appellant's attorney then asked that he have a continuing objection to the attorney's testifying and the court stated that it was already in the record. Moore contradicted Ms. Elliott's testimony and gave his version of her answers when he questioned her in the bank which was similar to the testimony of appellees. He stated that in his examination of Ms. Elliott in a discovery deposition, her testimony was exactly opposite to her statements on the occasion he questioned her in the bank.

The chancellor found that there was sufficient clear and convincing evidence that Mr. Herman Gibson intended to give these certificates to his two sons. The court based its decision in part on the fact that Herman Gibson never had the key to the box. The question, however, was not whether Herman had lost all dominion and control over these certificates. It was whether he clearly intended to relinquish all dominion and control. His collection of interest does not indicate that he did. His appearing and signing the signature card may have been an afterthought, or it may have been a clear indication that, at the time of delivery, he did not *intend* to surrender all dominion and control.

The testimony of the attorney in this case becomes very critical on the determination whether the evidence of Herman Gibson's intent to make a completed gift inter vivos is clear and convincing. It is particularly critical when it involves the credibility of a witness whose testimony was essential to the adversary's case. This was not a sudden development. The lawyer had known, at least since taking a discovery deposition in March, before the trial in May, that the witness would testify as she did, yet he actively participated in the trial. Not until the very end of the trial did the attorney withdraw from the case. When he did, his partner continued with the trial, in spite of objections by appellant's attorney.

The Code of Professional Responsibility adopted by this court includes the following provisions:

DR 5-101 Refusing Employment When the Interests of the Lawyer May Impair His Independent Professional Judgment.

* * *

(B) A lawyer shall not accept employment in contemplated or pending litigation if he knows or it is obvious that he or a lawyer in his firm ought to be called as a witness, except that he may undertake the employment and he or a lawyer in his firm may testify:

(1) If the testimony will relate solely to an uncontested matter.

(2) If the testimony will relate solely to a matter of formality and there is no reason to believe that substantial evidence will be offered in opposition to the testimony.

(3) If the testimony will relate solely to the nature and value of legal services rendered in the case by the lawyer or his firm to the client.

(4) As to any matter, if refusal would work a substantial hardship on the client because of the distinctive value of the lawyer or his firm as counsel in the particular case.

DR 5-102 Withdrawal as Counsel When the Lawyer Becomes a Witness.

(A) If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that he or a lawyer in his firm ought to be called as a witness on behalf of his client, he shall withdraw from the conduct of the trial and his firm, if any, shall not continue representation in the trial, except that he may continue the representation and he or a lawyer in his firm may testify in the circumstances enumerated in DR 5-101(B) (1) through (4).

We have been confronted with numerous problems in connection with testimony by attorneys engaged in the trial of a case over the past decade. The following cases have arisen: *Rushton* v. *First National Bank of Magnolia,* 244 Ark. 503, 426 S.W. 2d 378; *Old American Life Insurance Co.* v. *Taylor,* 244 Ark. 709, 427 S.W. 2d 23; *Montgomery* v. *First National Bank of Newport,* 246 Ark. 502, 439 S.W. 2d 299; *Cox* v. *Gulf Union Corp.,* 255 Ark. 120, 499 S.W. 2d 63; *Watson* v. *Alford,* 255 Ark. 911, 503 S.W. 2d 897; *McWilliams* v. *Tinder,* 256 Ark. 994, 511 S.W. 2d 480; *Dingledine* v. *Dingledine,* 258 Ark. 204, 523 S.W.

2d 189; *Canal Insurance Co.* v. *Hall*, 259 Ark. 797, 536 S.W. 2d 702; *Jones* v. *Hardesty*, 261 Ark. 716, 551 S.W. 2d 543; *Milburn* v. *State*, 262 Ark. 267, 555 S.W. 2d 946; *Enzor* v. *State*, 262 Ark. 545, 559 S.W. 2d 148; *McCoy Farms, Inc.* v. *J & M McKee*, 263 Ark. 20, 563 S.W. 2d 409.

In some of these cases we have recognized that there are cases in which the necessity for the lawyer testifying cannot be anticipated until a stage of the trial at which his withdrawal, or that of his firm, would be impossible without serious injustice to his client, and that withdrawal should not be expected in such cases. "[B]ut it should be clear that the necessity for the lawyer's testimony could not have been anticipated." *Montgomery* v. *First National Bank of Newport*, supra. If the lawyer's testimony was necessary in this instance, it should have been known two months prior to trial. It is not sufficient to leave further trial to a member of the testifying attorney's firm. *Old American Life Insurance Co.* v. *Taylor*, supra; *Montgomery* v. *First National Bank of Newport*, supra. Serving as appellate counsel after testifying is not even permissible. *Milburn* v. *State*, supra. We have indicated that an attorney should decide whether he should serve as a witness or as an advocate. *Enzor* v. *State*, supra.

In *Dingledine* v. *Dingledine*, supra, we pointed out observations in the Code of Professional Responsibility that an advocate who becomes a witness is put in the position of arguing his own credibility and that there is inconsistency in the function of an advocate to advance or argue the cause of another and that of a witness to state facts objectively. Credibility was the issue here.

Ordinarily, on trial de novo in this court, we avoid remand of a case reviewed under standards governing equitable procedures. In *McWilliams* v. *Tinder*, supra, we were able to do so. For reasons hereinbefore stated, we cannot do so here.

We are in somewhat the same position we found ourselves in *Rushton* v. *First National Bank of Magnolia*. There we reversed the decree in favor of the testifying attorney's client and remanded the case for a complete new trial, unprejudiced by any findings theretofore made, and we find it necessary to do so here.

We do not treat appellant's point C. It does not appear that fraud was an issue in the trial court. The chancery court did not treat it as an issue. We find no evidence in the record before us to support a finding of fraud.

The decree is reversed and the cause remanded for a new trial.