## AETNA CASUALTY AND SURETY COMPANY v. BROADWAY ARMS CORPORATION

83-134                                                        664 S.W.2d 463

Supreme Court of Arkansas
Opinion delivered December 19, 1983
[Substituted Opinion on Denial of Rehearing
February 21, 1984.*]

*HAYS and HOLLINGSWORTH, JJ., would grant rehearing.

*Anderson & Kilpatrick,* by: *Overton S. Anderson* and *Michael E. Aud,* and *Friday, Eldredge & Clark,* by: *William H. Sutton,* for appellant.

*Gary Eubanks & Associates,* by: *Gary L. Eubanks* and *Hugh F. Spinks,* for appellee.

JOHN I. PURTLE, Justice. Appellee filed suit against its insurance carrier based upon the tort of bad faith arising out of conduct involving the handling of a claim for damages resulting from a fire. The jury's verdict (by interrogatories) included a finding that the carrier had acted in bad faith resulting in damages to the appellee (insured) in the sum of $175,000 compensatory loss and $5,000,000 punitive damages. On appeal it is urged that: 1) the trial court erred in failing to direct a verdict on the issue of bad faith; 2) the court erred in instructing the jury; 3) the court erred in allowing an attorney for the appellee to testify; 4) damages awarded were excessive and not supported by substantial evidence; and 5) the court erred in failing to grant a new trial. For reasons stated below we reverse and remand.

Aetna Casualty and Surety Company (appellant) issued a fire insurance policy on property owned by Broadway Arms Corporation (appellee). The policy contained a rider providing for a 25% increase in coverage for loss during peak season. The coverage also included provisions for loss of business and up to $1,000 to be used to clean up the premises in case of loss. On August 22, 1981, a fire occurred on the insured's premises and all inventory was destroyed or damaged, resulting in the insured's business being shut

down. Aetna advanced appellee the sum of $30,000, as partial payment on the loss, a few days after the fire. A dispute over the ownership of the salvage arose and matters deteriorated between the insurer and insured. The appellee obtained the services of attorney Roger Glasgow to handle the claim.

On November 10, 1981, appellant offered appellee the sum of $63,225 for settlement of all claims under the policy. This offer included $45,000 for direct fire loss ($30,000 had been previously advanced), $1,000 cleanup and $17,225 for loss of business. The offer was rejected and appellee filed suit on December 4, 1981. Glasgow had originally agreed to represent appellee on an hourly basis; however the fee was not paid as billed and a contingent fee schedule was agreed upon on March 24, 1982. Subsequently, Glasgow associated Gary Eubanks to handle the case. The contract between appellee and Glasgow remains in effect. The two attorneys agreed to split the fee under the terms set out in the agreement of March 24, 1982. Although Glasgow withdrew as attorney of record he will get half of any fee collected in this case. He continued to represent Broadway Arms in other suits brought against them and was designated corporate representative for them during the trial of this cause and as such was allowed to sit at counsel table.

The matter was submitted to the jury on interrogatories. The interrogatories included answers to the effect that: 1) the coverage had not been increased to $100,000; 2) the coverage should increase by 25% for seasonal variation; 3) the loss of earnings was $40,191 in excess of $17,225; 4) the insurer acted in bad faith; and 5) appellee's damages were assessed at $175,000 compensatory and $5,000,000 punitive.

The first argument for reversal is that the court erred in refusing to direct a verdict on the pleadings which charged appellant with bad faith in handling the first party loss under the insurance policy issued to the insured by the insurer. Appellant argues that the Trade Practices Act (Act 148 of 1959), Ark. Stat. Ann. §§ 66-3001, et seq. (Repl. 1980), and the penalty and fees statute of Ark. Stat. Ann. §§ 66-3238 pre-empt the area upon which the tort of bad faith is

founded. We do not agree with this argument. Such interpretation would rule out third party claims of bad faith because the Trade Practices Act is only an effort to clean up undesirable conduct of insurers and the penalty and fees statute applies only to first party claims. The penalty and fees statute is the primary remedy an insured has against an insurer who fails or refuses to pay a claim when there is no bad faith. The Trade Practices Act provides for procedures and penalties to be utilized by the provisions of the act. Neither of these remedies deals with the area of bad faith much less pre-empts it.

We have previously recognized that bad faith is an actionable tort in Arkansas. In discussing the tort of bad faith in *Findley* v. *Time Ins. Co.*, 264 Ark. 647, 573 S.W.2d 908 (1978), we cited the earlier case of *Members Mutual Ins. Co.* v. *Blissett*, 254 Ark. 211, 492 S.W.2d 429 (1973), as authority for the premise that the tort of bad faith is an extension of the well established rule through which a liability insurance company can be held accountable in tort for failure to settle a claim within the policy limits. Although *Blissett* was decided on the question of negligence on the part of an insurer for failure to settle a third party claim within the policy limits of its insured, it did state that the action was a separate tort action. *M.B.M. Co., Inc.* v. *Counce*, 268 Ark. 269, 596 S.W.2d 681 (1980); *Findley* v. *Time Ins. Co., supra; Members Mutual Ins. Co.* v. *Busby*, 251 Ark. 568, 473 S.W.2d 893 (1971). In *Blissett* we settled the issue when we concluded that in order to be successful a claim based on the tort of bad faith must include affirmative misconduct by the insurance company, without a good faith defense, and that the misconduct must be dishonest, malicious, or oppressive in an attempt to avoid its liability under an insurance policy. Such a claim cannot be based upon good faith denial, offers to compromise a claim or for other honest errors of judgment by the insurer. Neither can this type claim be based upon negligence or bad judgment so long as the insurer is acting in good faith. We agree with the Ohio Supreme Court in *Columbus Finance* v. *Howard*, 42 Ohio St. 2d 178, 327 N.E.2d 654 (1975), holding that in an action of this type for tort, actual malice is that state of mind under which a person's conduct is charac-

terized by hatred, ill will or a spirit of revenge. Actual malice may be inferred from conduct and surrounding circumstances. Bad faith may give rise to either first or third party claims.

Three accusations of bad faith against Aetna were made in the present action. Appellee alleged: 1) refusal to pay policy limits under the fire coverage; 2) failure to release the salvage to the insured; and 3) a threat to report the transaction to the Internal Revenue Service. Less than 90 days after the loss the insurer offered to settle the matter for the lump sum of $63,225, which was in addition to the $30,000 advanced immediately after the fire. The offer was rejected by the insured. Suit was filed on December 4, 1981. The jury found appellee was due the additional sum of $58,941 under the policy provisions, which was more than the offer by the insurer. The jury found the appellant had committed acts of bad faith and awarded damages in the sums of $175,000 compensatory and $5,000,000 punitive. So far as the salvage is concerned it remained in the possession and control of the appellee at all times. Testimony indicates salvage was discussed in September following the fire and each party apparently thought the other claimed the right to the salvage. There is nothing about the handling of the salvage claim which appears dishonest, malicious or oppressive as a matter of law. The threat about the IRS is the final act of bad faith alleged in the complaint. The testimony on this subject indicates a representative of the insurer met with the insured's first attorney, Roger Glasgow, and during the discussion indicated that the insurer might be called on by the IRS to explain why it paid $75,000 on a loss when the books of the insured revealed an inventory value of $23,000. It is probable the claim agent's statement intended to put some type of pressure upon its insured to settle the claim. This matter being a fact issue, it will not be decided at this time because we are remanding for a new trial and the matter may or may not be presented in the same manner at the next trial.

The second argument for reversal is that the court erred in instructing the jury regarding the Trade Practices Act. A portion of this act [Ark. Stat. Ann. § 66-3005 (9)] includes a

section headed Unfair Claim Settlement Practices which states in part:

> Committing or performing with such frequency as to indicate a general business practice, any of the following:
>
> (a) Misrepresenting pertinent facts . . .
> (b) Failing to acknowledge and act reasonably and promptly . . .
> (c) Failing to adopt and implement reasonable standards for the prompt investigation of claims . . .
> (d) Refusing to pay claims without conducting a reasonable investigation . . .
> (e) Failing to affirm or deny coverage . . .
> (f) Not attempting in good faith to effectuate prompt, fair and equitable settlements of claims . . .

The contingent fee agreement has given us much concern. The agreement was entered into prior to the time the attorney had any idea he would be a witness. His fee agreement was reduced by fifty per cent when he decided to become a witness and employ other counsel to try the case. We are of the opinion that due to the special circumstances of this case he may testify and also share in the fee, provided he completely withdraws from participation in the case other than as a witness. Unless he completely severs his attorney-client relationship in this case he will not be allowed to testify on retrial. If he testifies as an expert witness he may not testify that Aetna acted in bad faith. To do so would not only touch upon the ultimate issue but would in effect tell the jury how to decide the case. *Gramling* v. *Jennings*, 274 Ark. 346, 625 S.W.2d 463 (1981).

The question of an attorney testifying in a case where he has an interest in the outcome has been considered and disapproved of by this court many times. In the case of *Boling, Adm'r.* v. *Gibson*, 266 Ark. 310, 584 S.W.2d 14 (1979), an attorney was called as a witness during trial and his partner continued with the trial. In holding that it was improper for attorneys to testify on the merits of the case

when an associate continued with the trial, we stated an attorney must decide whether he should serve as an attorney or as a witness. The same issue was addressed in *Enzor v. State*, 262 Ark. 545, 559 S.W.2d 148 (1977), wherein we stated:

> We must again take this opportunity to reiterate strongly our disapproval of an attorney testifying in an action in which he is an advocate. An attorney who is to testify in an action should withdraw from the litigation. On the other hand, if an attorney is going to serve as an advocate for his client, he should refrain from testifying in the action.

In discussing the testimony of an attorney in *Rushton v. First National Bank of Magnolia*, 244 Ark. 503, 426 S.W.2d 378 (1968), we said an attorney thus testifying becomes both "advocate and witness, one of which requires the lawyer to be partisan and the other of which requires him to be factual." We held that such testimony robbed the trial of the appearance of fairness which should characterize every court hearing. Although *Rushton* was reversed because the attorney testified to vital issues in the trial, we recognized that it is not always fatal for an attorney to testify when we stated: ". . . it is within the discretion of the trial court to permit a lawyer to testify in a case even though the rule has been invoked." However, this statement was made regarding lawyers who were not trying the case and related to exclusion under the rule.

We have adopted the American Bar Association Code of Professional Responsibility and the Disciplinary Rules contained therein. DR 5-102 (A) states:

> If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that he or a lawyer in his firm ought to be called as a witness on behalf of his client, he shall withdraw from the conduct of the trial and his firm, if any, shall not continue representation in the trial . . .

DR 5-105 (D) states:

> If a lawyer is required to decline employment or to withdraw from employment under a Disciplinary Rule, no partner, or associate, or any other lawyer affiliated with him or his firm, may accept or continue such employment.

DR 7-109 (C) states:

> A lawyer shall not pay, offer to pay, or acquiesce in the payment of compensation to a witness contingent upon the content of his testimony or the outcome of the case . . .

Arkansas Rules of Evidence, Rule 601, states:

> Every person is competent to be a witness except as otherwise provided in these rules.

The contingent fee agreement has given us much concern. The agreement was entered into prior to the time the attorney had any idea he would be a witness. His fee agreement was reduced by fifty per cent when he decided to become a witness and employ other counsel to try the case. We are of the opinion that due to the special circumstances of this case he may testify and also share in the fee, provided he completely withdraws from participation in the case other than as a witness. Unless he completely severs his attorney-client relationship in this case he will not be allowed to testify on retrial. If he testifies as an expert witness he may not testify that Aetna acted in bad faith. To do so would not only touch upon the ultimate issue but would in effect tell the jury how to decide the case. *Gramling* v. *Jennings*, 274 Ark. 346, 625 S.W.2d 463 (1981).

It is argued by appellant that the verdict was excessive and was not supported by the evidence. The evidence will no doubt be different on retrial. Therefore, we will not discuss it in this opinion. On retrial the evidence of bad faith must be sufficient to show affirmative misconduct of a nature which is malicious, dishonest, or oppressive.

The matter of granting a new trial is within the sound discretion of the trial court. *Dickerson Construction Co.* v. *Dozier,* 266 Ark. 345, 584 S.W.2d 36 (1979), and *General Motors Corp.* v. *Tate,* 257 Ark. 347, 516 S.W.2d 602 (1974). In the present case appellant has tried to couch the argument of impeaching the verdict by the jury in a manner approved by the *Arkansas Uniform Rules of Evidence,* 606(b). However, the so called extraneous prejudicial information went only to the state of mind of a juror while deliberating. Such matters are clearly prohibited by Rule 606 (b) which states in part:

> ... a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him ...

We have tried to make it clear in prior decisions that it is improper for a lawyer to try to impeach a jury verdict by affidavits obtained from members of the jury panel. *Martin* v. *Blackmon,* 277 Ark. 190, 640 S.W.2d 435 (1982). The trial court did not err in refusing to set aside the verdict and grant a new trial because of misconduct of jurors.

For the reasons set out above, this case is reversed and remanded.

ADKISSON, C.J. and HAYS, J., concur.

HICKMAN, J., concurs in part and dissents in part.

HOLLINGSWORTH, J., not participating.

DARRELL HICKMAN, Justice, concurring in part, dissenting in part. We are recognizing in·this case that there exists a cause of action by an insured against his insurance company for bad faith or outrageous conduct. Such a cause of action is for both compensatory and punitive damages, but the emphasis is on the punitive aspect — because if the conduct of the insurance company is outrageous, it ought to be punished. The majority opinion does not refer to the new tort as outrage, but as one arising out of bad faith.

It is generally agreed that this tort was first recognized in California and is undergoing a period of refinement. Other states are following that trend to one degree or

another. Allen, *Insurance Bad Faith Law: The Need for Legislative Intervention,* 13 Pac. L.J. 833 (1982); Benton and Johnson, *The Tort of Bad Faith: A Perspective Look at The Insurer's Expanding Liability,* 8 Cum. L. Rev. 241 (1977).

In the case of *Findley* v. *Time Ins. Co.,* 264 Ark. 647, 573 S.W.2d 908 (1978), we left unanswered the question of whether we would recognize this new tort, but laid down quite plainly the elements of the tort, if we did choose to recognize it. In *Givens* v. *Hixson,* 275 Ark. 370, 631 S.W.2d 263 (1982), we sharply defined our understanding of the tort of outrage. We said:.

> The new and still developing tort of outrage is not easily established. It requires clear-cut proof. 'Liability has been found *only* [our italics] where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.' Restatement of Torts (2d), § 46, Comment d (1965); *M.B.M. Co.* v. *Counce,* 268 Ark. 269, 569 S.W.2d 681 (1980). It is for the trial court to determine, in the first instance, whether the conduct may reasonably be regarded as so outrageous as to permit recovery. Restatement, *id.,* Comment H.

The majority opinion is in every respect in line with the *Findley* case. The tort can only be based upon an affirmative act of intentional dishonest, malicious, or oppressive conduct by a company to avoid its liability. Those are strong words, and impose a heavy burden on an insured, as they well should, because Arkansas has an adequate remedy for an insured against a company that either refuses or through nonfeasance will not honor its contract obligations. *See* Ark. Stat. Ann. § 66-3001 *et seq.* (Repl. 1980). While good reasons for recognizing this cause of action exist, the tort should not be merely a new legal tool to collect attorney's fees, or a means of intimidating the insurance industry so it cannot fairly and reasonably resist false, suspicious or even disputed claims.

That is the reason I characterize the new tort as outrage, because it better describes the kind of conduct that should

result in punishment. Bad faith can be, in my judgment, interpreted by jurors as merely negligence, and this tort is not one of negligence — it is one of intentional malicious, dishonest and oppressive conduct.

The evidence in this case does not justify a finding that Aetna is guilty of such conduct. Negligence, and poor judgment, probably; outrageous conduct, hardly. The only real evidence the appellee presented that could support a finding of intentional oppressive conduct was the reference to the statement by the adjuster that he might be called on to explain to the Internal Revenue Service why Aetna would pay $75,000 when there was only $23,000 inventory on the books. That statement could be taken either way. The adjuster had from the beginning questioned the records of the appellee which were admittedly deficient. He had the responsibility to pay a substantial amount for a fire loss and had every right to question how much loss there actually was. Furthermore, this was a conversation between a lawyer hired by the appellee to get the maximum benefits under the policy and an adjuster hired to see that no more was paid than was owed under the policy. The attorney said it was his "impression" it was a threat. That is not "clear-cut" proof; standing alone that is not enough, by any test, to support a finding of outrageous conduct which resulted in a $5,000,000 judgment for punitive damages.

It is a judgment question on our part that Lawyer Glasgow should not have been allowed to testify under the circumstances of the case, as it was tried below. We do not find that there was any unethical conduct on his part. Glasgow did immediately withdraw from the case when he saw he might have to be a witness. At that time he saw that there might exist a suit against Aetna for outrage. He already had a contingent fee arrangement with the appellee, and it was not changed when new lawyers were hired to pursue the suit. He did sit at the counsel table throughout the trial, but apparently as a representative of the corporation, Broadway Arms, and therein lies the problem. It could easily appear he was counsel in the case. Our rule against lawyers testifying in a case in which they continue to participate as attorneys has become fixed — we will not allow it. *Bishop* v. *Linkway Stores, Inc., supplemental opinion,* 280 Ark. 124, 655 S.W.2d

426 (1983); *Boling* v. *Gibson,* 266 Ark. 310, 584 S.W.2d 14 (1979). That is a relatively recent position of ours. Certainly the lawyer can testify on a retrial, he just cannot participate in any way in the suit, nor appear to. The reason we do not allow lawyers to tetify in a case in which they are counsel is because of the special role a lawyer plays as an officer of the court and advocate. He should not be allowed to play that role in front of a jury and then testify under oath to something that will aid his case. *See Boling* v. *Gibson, supra.*

I would reverse the judgment and dismiss the cause.

RICHARD B. ADKISSON, Chief Justice, concurring. Mr. Roger Glasgow, an attorney, entered into a contingent fee arrangement with Broadway Arms in regard to an insurance contract claim against Aetna. During settlement negotiations, it appeared to him that a tort claim against Aetna had arisen as a result of Aetna's bad faith in fulfilling the terms of their insurance contract. At that time Glasgow, realizing that he would be a witness in regard to the tort claim, partially withdrew from the case, and another attorney, Gary Eubanks, was hired by Broadway Arms to prosecute the tort claim. Glasgow, however, continued to participate through the contingent fee arrangement, not only in the contract claim, but also in regard to the tort claim in which he intended to testify. Glasgow's full and complete withdrawal from the tort claim was required by the American Bar Association Code of Professional Responsibility and the Disciplinary Rules which this court has adopted. DR 5-102 (A) states:

> If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that he or a lawyer in his firm ought to be called as a witness on behalf of his client, he shall withdraw from the conduct of the trial and his firm, if any, shall not continue representation in the trial . . .

This court, in its opinion, failed to distinguish between the two causes of action in stating that Glasgow could participate through the contingent fee plan. The damages are distinguishable. Glasgow should be allowed to partici-

pate in the contract claim pursuant to the initial fee arrangement; otherwise he would be completely deprived of his fee since he could not unilaterally alter the agreed fee arrangement. However, he should not participate in fees resulting from the tort claim since he was to be a witness.

Also, Mr. Glasgow is prohibited from sharing in the contingent fee arrangement regarding the tort claim for yet another reason. The American Bar Association Code of Professional Responsibility provides:

DR 7-109(c):

A lawyer shall not pay, offer to pay, or acquiesce in the payment of compensation to a witness contingent upon the content of his testimony or the outcome of the case . . .

This section prohibits the payment of a witness contingent upon the outcome of a case. If Mr. Glasgow participates in the contingent fee arrangement regarding the tort claim, his compensation will necessarily be contingent upon the outcome of the case, a practice clearly prohibited by the Code of Professional Responsibility.

STEELE HAYS, Justice, concurring. With some misgivings, I concurred in our original opinion on the issue of whether attorney Roger Glasgow should be permitted to testify on behalf of the appellee on retrial, and still retain a substantial fee contingent on the outcome of the trial. I found no clear authority on the point and thought that since the jury would be informed of the fee arrangement, that would cure the obstacle. I believe that was a mistake that should be corrected on rehearing.

I have come to this view: Mr. Glasgow may testify on retrial on condition that he entirely disassociate himself from the case or any interest in the outcome. Such hourly fee as he had earned at the time he withdrew and associated other counsel is, of course, due him, but it is due irrespective of the trial and its result. I have nothing definitive to anchor this position to, but if DR 7-109 of the Canons makes it improper for a lay witness to be paid contingent on the outcome, how can it be acceptable for a lawyer witness to be

paid on that basis? Beyond that, if a lawyer is not professionally associated in a case regardless of who actually tries it, why is he being paid a contingent percentage of any recovery? The very fact of a contingent fee arrangement suggests that he is still associated in the case.

I have no concern that Roger Glasgow would not adhere strictly to the truth as he sees it, I simply think it is impossible for any witness, however well-intentioned, to weigh facts and retain impressions of events, so as to testify with objectivity when they have a heavy stake in the outcome. The law makes exception for the litigant, of course, but that exception should not be extended to witnesses who are not parties.