# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 98-1398

_____

| | | |
|---|---|---|
| H&H Brokerage, Inc., | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Eastern District of Arkansas. |
| Vanliner Insurance Company, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: September 24, 1998

Filed: February 24, 1999

_____

Before WOLLMAN, JOHN R. GIBSON, and MORRIS SHEPPARD ARNOLD, Circuit Judges.

_____

MORRIS SHEPPARD ARNOLD, Circuit Judge.

H&H Brokerage (H&H) arranged for a shipment of goods owned by Singer Sewing Company (Singer) to be carried by R&R Trucking (R&R). The shipment was stolen from R&R's possession before it was delivered. Singer submitted a claim to R&R's insurance company, which denied the claim on the ground that R&R's policy did not cover Singer's damages. Singer then demanded that H&H compensate it for its damages, and suspended its business with H&H until H&H should do so.

H&H contacted its own insurance carrier, Vanliner Insurance Company (Vanliner), which informed H&H that its policy did not cover the cost of lost goods if R&R's insurance did not do so (such coverage is "contingent cargo liability coverage"). H&H then paid Singer and sued Vanliner under Arkansas law for breach of contract and the tort of bad faith. A jury awarded approximately $84,150 to H&H (the amount that H&H had paid to Singer) for the lost goods, approximately $11,750 for H&H's lost profits (from the temporary loss of Singer's business), and $50,000 in punitive damages. The trial court denied Vanliner's motion for judgment notwithstanding the verdict (JNOV) and entered judgment for H&H.

Vanliner appeals. We can reverse only if "after viewing the evidence in the light most favorable to the verdict, we conclude that no reasonable juror could have returned a verdict for [H&H]." Ryther v. KARE 11, 108 F.3d 832, 836 (8th Cir. 1997) (en banc), cert. denied, 117 S. Ct. 2510 (1997). After a careful examination of the record, we affirm the judgment with respect to the cost of the lost goods, and reverse with respect to the lost profits and the punitive damages.

I.

Vanliner contends that the contract that it entered into with H&H did not include contingent cargo liability coverage, and that Vanliner is therefore not responsible for the cost of the lost goods or for any other damages suffered by H&H. Although there was no clause in the contract specifically providing such coverage, at trial H&H relied on the language of the "general conditions" clause of the "motor cargo liability policy," which states that "[t]his policy covers the liability of the insured for loss or damage to lawful goods and merchandise while in the custody or control of the insured." The policy thus requires only that the goods be in either the custody or the control of the insured.

H&H concedes that it did not have custody of the goods but contends that they were in its control. In support of this proposition, H&H presented evidence that it

-2-

selected the trucking company, directed how, where, and when the goods were to be delivered, negotiated the price that the owner of the goods was to be charged, handled all of the paper work, instructed the truck driver to stay in contact, and had the power to make route changes during shipping. We believe that this evidence provided a sufficient basis for the jury to find that H&H was in control of the goods when they were stolen, and that Vanliner was therefore obligated to compensate H&H for the loss of those goods. We thus affirm the judgment for H&H with respect to the cost of the lost goods.

## II.

Vanliner contends further that the jury's award of damages for the temporary loss of Singer's business should be overturned because consequential damages of this kind are not available in cases for breach of contract under Arkansas law unless the party charged has agreed to pay them. H&H responds that because its lawsuit includes a claim for the tort of bad faith, no agreement was necessary for an award of consequential damages.

In support of the contention that H&H's consequential damages were tied exclusively to the claim for breach of contract, however, and not to the claim for the tort of bad faith, Vanliner points to the interrogatories submitted to the jury. The third interrogatory asked if H&H suffered "loss of profits as a result of Vanliner's breach of the insurance contract," and the next interrogatory asked for the amount, if any, of those damages. It was not until the fifth interrogatory that the tort of bad faith was mentioned, and the next interrogatory inquired about punitive damages in connection only with that tort.

Perhaps the trial court erred by failing to instruct the jury that it could assess consequential damages on the tort claim. H&H, however, did not object to the instructions or the interrogatories at trial and does not maintain on appeal that they were erroneous in any respect. In any event, to the extent that the instructions or the

interrogatories were error, they were harmless error, because H&H is not entitled to consequential damages with respect to either the tort claim or the contract claim.

Consequential damages are inappropriate with respect to the contract claim because no reasonable jury could have found that there was an agreement on Vanliner's part to pay such damages. See, e.g., Bankston v. Pulaski County School District, 665 S.W.2d 859, 862 (Ark. 1984), and Hawkins v. Delta Spindle of Blytheville, Inc., 434 S.W.2d 825, 828 (Ark. 1968). Consequential damages are inappropriate with respect to the tort claim because, as we demonstrate below, that claim fails as a matter of law. The judgment for consequential damages therefore cannot stand, and we reverse it.

III.

Vanliner contends that the trial court should have granted a JNOV with respect to H&H's claim for bad faith. The parties agree that Aetna Casualty and Surety Co. v. Broadway Arms Corp., 664 S.W.2d 463 (Ark. 1984), outlines the Arkansas law governing that tort. A bad faith claim "must include affirmative misconduct by the insurance company, without a good faith defense, and ... the misconduct must be dishonest, malicious, or oppressive." Id. at 465. Actual malice, "that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit or revenge," is required. Id.

H&H contends that the verdict on the bad faith claim was supported by the facts that the policy clearly covered the loss of the goods, that the underwriter was inexperienced, that the underwriter stated that he had intended to include contingent cargo liability coverage in the policy, that H&H had paid premiums specifically designated for such coverage, that H&H had always maintained such coverage with previous insurers, that Vanliner was aware that Singer was H&H's biggest client, that Vanliner's review committee had no real insurance experience, and that Vanliner was experiencing possible financial difficulties. Much of this evidence is simply

-4-

irrelevant to the issue of bad faith, and what little probative value the rest of it has, it seems to us, makes for only a very weak inference that Vanliner's actions were "dishonest, malicious, or oppressive," or that Vanliner's refusal to pay the claim on the grounds that the policy did not cover the loss was anything other than a "good faith defense," id.[1]

In any case, under Arkansas law, extrinsic evidence of the meaning of a contract is admissible, and the meaning of a contract is a question of fact for the jury, only when the contract is ambiguous. See, e.g., Precision Steel Warehouse, Inc. v. Anderson-Martin Machine Co., 313 Ark. 258, 266, 854 S.W.2d 321, 325 (Ark. 1993); First National Bank of Crossett v. Griffin, 310 Ark. 164, 168-69, 132 S.W.2d 816, 818-19 (1992). The trial court in this case admitted extrinsic evidence and submitted the contract's meaning to the jury, evidently in the belief that the contract was ambiguous, a belief that we share.[2] We think, moreover, that where a contract is ambiguous, a defendant's reliance on one of its permissible constructions provides a "good faith defense," Broadway Arms, 664 S.W.2d at 465, as a matter of law. We hold that Vanliner's interpretation of the contract was more than reasonable, and that the verdict on the bad faith claim therefore cannot stand.

## IV.

For the reasons stated, we affirm the judgment of the trial court with respect to the cost of the lost goods, and reverse with respect to the lost profits and the punitive damages.

---

[1]Judge Gibson, in his dissent, misapprehends the import of these observations. We do not feel that it is necessary to reach the question of whether the evidence outlined was sufficient to go to the jury because of what follows.

[2]Judge Gibson, in his dissent, indicates his belief that the language of the contract is not ambiguous. If that were so, then the case was not properly submitted to the jury, for its meaning, and its application to the undisputed facts, would have been a matter for the trial court.

JOHN R. GIBSON, Circuit Judge, concurring in part and dissenting in part.

I concur with Part I of the court's opinion which affirms the judgment for H&H in the amount of $84,158.40 for the loss of cargo.

With respect to Part II of the court's opinion, I have no quarrel with the court's conclusion that there was no agreement by Vanliner to pay consequential damages, but I dissent from that portion of Part II that holds that H&H's claim for consequential damages on the tort claim fails for lack of evidence, and to all of Part III of the court's opinion in which this issue is further developed.

This court, in the past, has spelled out, in somewhat greater detail than today, the standards governing our review of a decision on a motion for judgment as a matter of law. We begin with our familiar four-part expression of the rule. Evaluating a judgment as a matter of law requires the court to: (1) resolve direct factual conflicts in favor of the non-movants; (2) assume as true all facts supporting the non-movant which the evidence tended to prove; (3) give the non-movant the benefit of all reasonable inferences; and (4) deny the motion if the evidence, so viewed, would allow reasonable jurors to differ as to the conclusion that could be drawn. See Ryther v. Kare 11, 108 F.3d 832, 844 (8th Cir. 1997) (en banc), cert. denied, 117 S.Ct. 2510 (1997); White v. Pence, 961 F.2d 776, 779 n.4 (8th Cir. 1992) (citing Dace v. ACF Indus., Inc., 722 F.2d 374, 375 (8th Cir. 1984)). The question of whether there is sufficient evidence to support a jury verdict is a legal one. White, 961 F.2d at 779. The evidence must be analyzed in the light most favorable to the prevailing party, and the court must not engage in weighing or evaluation. See id. Only when there is a complete absence of probative facts to support the conclusion reached does a reversible error appear. See Lavender v. Kurn, 327 U.S. 645, 653 (1946).

These cases demonstrate the need for a more thorough examination of the trial record than the court engages in today. I will set forth the facts under the standards

-6-

articulated above so as to provide a fuller basis for determining whether the evidence supports the jury's verdict.

In my view, this evidence supports reasonable inferences of affirmative misconduct and a denial of coverage without a good faith defense--misconduct that was oppressive and characterized by ill will. These inferences would have satisfied the instructions given on bad faith and sustained the jury's verdict in favor of H&H on the issue.

Sharon Hay, the owner of H&H, testified that she applied for contingent cargo coverage. Ralph Haymond, an experienced insurance agent in the trucking industry, stated that contingent cargo coverage was common in the industry and that different companies had different ways of extending contingent cargo coverage.

The application named both H&H Trucking and H&H Brokerage as insureds. William Woodruff, the underwriter on the policy, testified that the application requested contingent cargo insurance. He was inexperienced in this area, unsure of what to do, and went to Orlan McClain, his supervisor. McClain explicitly told him that Vanliner would provide contingent cargo coverage so long as the broker was named as an insured and the revenue from the brokerage company was included in the calculation of policy premiums. The policy application provided general information on H&H Brokerage and listed its brokerages' revenue as increasing from $850,000 to $1,000,000 in the year in question. The total revenue on which premium calculations were to be based was $2.8 million, which included both the brokerage figure and the trucking figures. Woodruff admitted that H&H requested, and the policy was issued for, contingent cargo insurance. McClain denied knowledge of the conversation with Woodruff and denied that Vanliner issued such coverage. He described the Vanliner policy as a small fleet policy and the standard motor cargo liability coverage as commercial inland marine coverage. This is a generic type of

coverage that covers goods that are not in one place and could cover goods in transit.[3]

The policy provided coverage for the liability of H&H Brokerage for loss and damage of property "while in the custody or control of the insured (and while in the custody of connecting carriers)."[4]

Haymond stated that this "custody or control" language covered the goods in question. McClain admitted that physical custody was not necessary for control to be present.

Hay testified that H&H Brokerage had control over the goods being hauled by the other trucker, R&R. "I tell him what to do until he's delivered and empty." H&H had the right to pick the trucker, to direct how, where, and when a load would be delivered, and to change the route if need be. H&H told the trucker when to call in, twice a day if necessary, so the customer could be informed and so any change in plans could be communicated. H&H negotiated the price to be charged with the owner of the goods and handled the paper work in connection with the brokered load.

Gail Preston, Vice President of Underwriting and Claims Administration of Vanliner, corroborated much of the above. She agreed that if Woodruff did not know how to do something, he would go to McClain, the underwriting manager she supervised, who had the authority to instruct Woodruff on how to proceed. She

---

[3]Gail Preston, Vice President of Underwriting and Claims Administration, stated that Vanliner wrote the policy and determined what kind of coverage it wanted to write. It belongs to the ISO (Insurance Services Office) which develops insurance policy language that members such as Vanliner can use. The motor cargo liability policy has a notation at the bottom indicating that it was a Vanliner form.

[4]Much additional discussion about contingent cargo insurance was irrelevant in view of the coverage written by Vanliner.

testified that Vanliner included the $1,000,000 in brokerage revenue in the premium calculations because it was in the application. Further, she admitted the committee that reviewed applications submitted to Vanliner had no real insurance experience and was primarily concerned with how much money was to be made, particularly with small policies such as H&H's.

When Preston was asked why the coverage did not cover the loss in question, she answered that the goods were lost while they were outside the custody or control of the insured. When asked why Hay's testimony about the brokered load did not show control, she answered that Vanliner was looking at "a lot of things about an account," whether the drivers were adequately qualified and trained, whether DOT regulations were met, whether the equipment is maintained properly and training is provided on equipment maintenance, and how the shipment should be loaded and packed. Preston stated that "controlling" means that one has to have the power or ability to ensure that a specific or certain outcome will result, and once the goods are in the custody of someone else they have no way of knowing who the driver is, the quality of the equipment, how the goods are loaded, or whether they are going to a carrier's yard where they may not be secured. She did not believe that a broker could have any control over the things that she had mentioned. She did not know how a broker could control the security of the yard of another carrier.

She admitted the "custody or control" language had separate components. When describing the difference between the words "and" and "or," she stated that if the policy said custody "and" control, "you would have both conditions present," and if the language was custody "or" control, "you have one or the other conditions present." She could not think of a situation where a named insured could have control without having custody. "No, I can't. We use the two words together." When asked the purpose of having a policy that uses the phrase "custody or control" instead of "custody and control," she stated that she did not write the policy; it had been in use for a number of years, and her interpretation of it is "that the two things go

together . . . . [y]ou can't have control without custody." She knew of an earlier policy issued by Kemper Insurance Company to H&H, using the phrase "custody and control."

The denial letter of December 13, 1995, written by Director of Claims Wayne Barker, stated that R&R Trucking was the hauler of the goods and denied the claim because the goods were never in the "care, custody, or control of H&H Brokerage."

Barker wrote to H&H's counsel on February 14, 1996. He again stated that R&R hauled the goods, and further, "As far as contingent motor truck cargo coverage, we have never seen a policy form nor have we ever issued any to my knowledge. Most cargo forms are based on the insured's liability, and in this instance, Singer Sewing Company has never alleged nor proven any negligence or liability against H&H Trucking or H&H Brokerage."

These denials were made at a time when Vanliner was experiencing financial difficulty. Indeed, its "A.M. Best Rating" had been dropped. Its reserves in the general freight line of business were inaccurately estimated, and claims were coming in for a higher amount than reserves. This in turn caused, in Preston's words, "a lot more severe losses." As a result, in 1995, Vanliner decided they did not want to take on any more general freight risk.

The evidence also indicated that Vanliner was aware of H&H's reliance on Singer, as its most important customer.

The court's conclusion that the evidence we have outlined above is irrelevant to the issue of bad faith, and what little probative value it has makes only for a very weak inference of such conduct, simply fails to consider the evidence in the light of the controlling standards. The comment of the court demonstrates that it is engaging in the weighing or evaluation of inferences. White prevents us from so doing.

-10-

When the record we have discussed above is considered in the light most favorable to H&H Brokerage, it is sufficient to support the findings of the jury that there was affirmative misconduct in denying the claim without a good faith defense, and that the misconduct was oppressive in an attempt to avoid liability under the policy. The language of the motor cargo liability provisions, with H&H Brokerage an insured, covered loss and damage of property "while in the custody or control of the insured." The underwriter, McClain, specifically stated that such coverage had been issued. Hay's testimony established the control that met this policy requirement. Preston, responsible for both underwriting and claims, testified that the two words "custody and control," when joined by the word "or," required that only one of the conditions need be present. She then stated that Vanliner used the words together, and one could not exist without the other. This conflict and others in her testimony, together with the conflict in the basis for the two denial letters and the testimony concerning the financial difficulties of Vanliner and the status of its review committee, are all sufficient to create either the direct evidence required by the instructions on bad faith, or inferences that could reasonably be derived therefrom, to support the jury's verdict under the instructions given by the court.

The court's comment today that the ambiguity of the contract provides a good faith defense for Vanliner, simply does not wash under the jury instructions. Whether extrinsic evidence of the meaning of the contract was admitted is beyond the point. The jury was instructed, first, to determine whether there was a contract for insurance, and, second, if there was, and they found it to be ambiguous or were uncertain of its meaning, to read it against Vanliner, the entity that drafted it. The jury was not required to make specific finding that there were ambiguities in the contract or resolve the conflicts, nor did it do so. The decisions relied upon by the court simply do not support the court's position that if there is an ambiguity in the contract, reliance on one permissible construction is a good faith defense.

-11-

The motor cargo liability policy covering property in the "custody or control" of the insured was not ambiguous. The court today does not attempt to demonstrate more than one meaning for the phrase. Indeed, there can be no better answer to the argument of ambiguity than the statement of Preston that the two words, when coupled with the word "or," led to a conclusion that one of the two conditions could create coverage. Preston blatantly ignored this plain meaning of the language by stating that Vanliner had always substituted "and" for "or". This is simply not a permissible reading of the language.

This is a diversity case and perhaps we should not delve into the niceties of such issues under state law. I am compelled to dissent because I believe that the court today either picks and chooses from the record before us, or ignores it entirely, when our obligation is to consider the record in a light most favorable to H&H.

I would affirm the judgment of the district court in all respects.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

-12-